UNITED STATES of America

v.

Charmaine Y. ZEIGLER, Appellant.

No. 91–3301.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 25, 1993.

Decided June 4, 1993.

Jonathan S. Zucker, Washington, DC (appointed by this court) argued the cause and filed the brief, for appellant.

Barbara K. Bracher, Asst. U.S. Atty., Washington, DC, argued the cause, for appellee. With her on the brief were Jay B. Stephens, U.S. Atty. at the time the brief was filed, John R. Fisher and Thomas C. Black, Asst. U.S. Attys., Washington, DC.

Before: EDWARDS, D.H. GINSBURG, and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

This appeal from a criminal conviction raises an old problem. The government's evidence falls short of proving guilt beyond a reasonable doubt. Nevertheless, the trial court denies the defendant's motion for judgment of acquittal. The defense puts on its case and the defendant takes the stand. The jury then returns a verdict of guilty. Perhaps the defendant's demeanor, itself evidence, caused the jury to infer that the truth was the opposite of what the defendant said. However, as Judge Learned Hand wrote in *Dyer v. MacDougall*, 201 F.2d 265, 269 (2d Cir.1952), the demeanor evidence has "disappeared." Should an appellate court nevertheless affirm on the supposition that the defendant's demeanor filled the gap in the

government's proof; or should the court reverse because the record does not reveal sufficient evidence to support the conviction? We mentioned the issue in *United States v. Jenkins,* 928 F.2d 1175, 1178–79 (D.C.Cir. 1991), but did not decide it.

I

Charmaine Y. Zeigler was tried before a jury for possessing with intent to distribute crack cocaine, 21 U.S.C. § 841(a) & (b)(1)(B)(iii); and for using and carrying firearms during and in relation to that offense, 18 U.S.C. § 924(c)(1). Her co-defendant, Devon A. Waite, faced these charges and the additional charge of knowingly receiving, possessing, and transporting firearms in interstate commerce after having been previously convicted of a felony. 18 U.S.C. § 922(g)(1).

The government's evidence showed that police officers executing a search warrant forcibly entered an apartment at 11 Galveston Place, Southwest. The apartment, formerly two units side by side, occupied the top floor of a small two story building. Facing the front of the building, Waite's bedroom had been the living room of apartment # 3, on the building's left side. A rear door in this room led to a hallway. Directly across the hallway was a kitchen, in the far left rear of the apartment. Down the hallway and adjacent to the kitchen was a bedroom. Apartment # 4, on the right side, had the same configuration, with a living room in the front; a laundry room (apparently a former kitchen) across the hallway in the right rear of the apartment; and an adjacent bedroom. The two apartments had been converted to one. The hallway in each, which separated the front rooms and the kitchen (or laundry room) and each apartment's bedroom in the rear, now ran the entire width of the apartment.

After the officers entered, they found three people inside, each of whom they placed in custody. The officers spotted Waite crossing the hallway between his bedroom and the kitchen, on the left side of the apartment. They found Zeigler in Waite's bedroom. A third individual, Angela Hicks, was in the bedroom of former apartment # 4, on the right side.

The search of Waite's bedroom turned up a small bag of marijuana on the headboard of the bed; a Ruger .22 caliber semiautomatic pistol on the floor behind a chair; $254 in cash and a money order on the dresser; also on the dresser, an ammunition pouch containing two speed loaders each with six rounds of .38 caliber ammunition. In the trash can in the kitchen across from Waite's bedroom was a loaded Sports Arms .38 caliber revolver.

Down the hallway, in the living room, the officers found $533 in cash under a seat cushion, a bag of marijuana, and 7 rounds of 9 millimeter ammunition in a teapot.

The door to the laundry room, in the right rear corner of the apartment opposite the living room, was locked with a hasp and a padlock. The officers ripped the lock from the door and entered. Inside was a washing machine and a maroon briefcase, locked with combination locks. The briefcase contained 5.5 grams of crack cocaine, a razor blade, a Walther PPK .38 caliber semiautomatic handgun, $740 in U.S. currency, and two money orders.

Apart from the clothes she was wearing and the bag of marijuana, the officers found no personal effects of Zeigler's in the apartment—no documents, personal papers, bills, extra clothing, or the like.

While the search was underway, the officers moved Zeigler, Waite, and Hicks to a couch in the living room, and asked each of them their name and where they lived. Zeigler identified herself and said she lived at "11 Galveston Place, Southwest."

After presenting this evidence, the government called Barbara Anderson, the owner of the apartment building. She testified that she rented the top floor of the building to Waite and collected the rent from him, either in cash or money orders. Anderson thought Zeigler "lived" there with Waite. She based this conclusion on her seven or eight visits to the building between the summer of 1990 and October 2, 1990, when the search took place. During these visits she saw Zeigler, although not each time. She also called Waite; Zeig-

ler answered the telephone. On one occasion, Zeigler—in response to Anderson's question about a crib standing just outside Waite's bedroom—said she was pregnant. (The police did not find a crib in the apartment.) Anderson also believed that Waite had rented part of his apartment to another woman and that a George Pope also lived there for a time.

At the close of the government's case,[1] Zeigler (and Waite) moved, pursuant to Rule 29, Fed.R.Crim.P., for a judgment of acquittal. The district court summarily denied the motions.

Waite then put on his defense. He produced three witnesses to support his theory that the top floor apartment consisted of two distinct apartments, and that while the cocaine had been found in the right portion of the apartment, Waite exclusively occupied the left. Waite did not testify.

Zeigler took the stand in her defense. She admitted that the marijuana in Waite's bedroom was hers. She said that Waite was her boyfriend; that she had "been staying [at his apartment] off and on for two or three months"; that she stayed only in the portion formerly used as apartment #3 and never ventured to the other side; and that Angela Hicks occupied the other side. According to Zeigler, she did her laundry at a laundromat with her mother, did not know there was a washing machine in the apartment, had never seen the door to the laundry room, and did not know who had the combination to the padlock on the laundry room door. She denied seeing any cocaine or guns in the apartment. When asked about the maroon briefcase, Zeigler said that she had never seen Waite with it but "Angie had a briefcase like it." She disclaimed any knowledge of the combinations to the locks on the briefcase.

Zeigler's parents also testified. According to her mother, Zeigler stayed at Waite's apartment only a few nights a week. On her three visits to Waite's apartment, her daughter and Waite were occupying only the left side of the apartment. Zeigler's father testified that his daughter lived with him during August and September of 1990, although she did not spend every night at home.

The jury acquitted Zeigler (and Waite) of possession with intent to distribute and of possession of a firearm in relation to that offense. The jury convicted Zeigler (and Waite) of the lesser included offense of possession of a controlled substance. 21 U.S.C. § 844(a). Waite was also convicted of one count of unlawful possession of a firearm.

At the close of evidence, Zeigler had renewed her motion for a judgment of acquittal, as had Waite. After the verdict the district court denied the motions in a memorandum opinion. As to Zeigler, the court stressed her relationship with Waite and her frequent presence in the apartment. The court also found "as the jury obviously did, that much of Zeigler's testimony was not credible insofar as it was intended to protect Waite." She testified "that she never saw guns ... in the apartment, although there was other testimony that weapons [and] weapons accessories ... were in plain view in the bedroom in which Zeigler was present at the time of her arrest."[2]

## II

### A

The general issue is whether sufficient evidence supports Zeigler's conviction for possession of the cocaine. Viewing the government's evidence in the light most favorable to it, we do not detect enough proof to connect Zeigler to the cocaine found in the

---

1. The government also presented several expert witnesses who testified about the guns, the chemical analysis of the cocaine, and the *modus operandi* of drug dealers.

2. Zeigler also moved for a new trial on the basis of newly discovered evidence contained in an affidavit of Angela Hicks. Defense counsel stated that he had been unable to locate Hicks prior to trial. In her affidavit executed after trial, Hicks swore that she had been living on the right side of the apartment for about a month before the search; that she had been taken there by "Tony Ford"; that Ford was the only person she had ever seen go into the laundry room (where the cocaine was discovered); that she—Hicks—owned a "brown burgundy briefcase" while she was living in the apartment but that she did "not know what happened to it." The court denied the motion.

laundry room. Nothing indicated that she actually possessed the cocaine. Her guilt depended on the government's proving beyond a reasonable doubt that she constructively possessed it, that she "knew of, and was in position to exercise dominion and control over" the cocaine. *United States v. Byfield,* 928 F.2d 1163, 1166 (D.C.Cir.1991); *United States v. Johnson,* 952 F.2d 1407, 1411 (D.C.Cir.1992). Zeigler's frequent presence in the apartment, the scene in the bedroom when the police arrived, and the landlady's testimony established her close ties with Waite and with the premises. Even so, where in the government's case is there proof that Zeigler knew of the cocaine? Her knowledge might have been inferred if Waite were selling drugs from the apartment. But the government presented no such evidence; and, in any event, the jury acquitted both defendants of the distribution charge.

Even if there were evidence of Zeigler's knowledge of the cocaine, the government's case would still fall short. Zeigler was near the cocaine, down the hallway from it when the police arrived. But " 'mere proximity or accessibility to contraband will not support a conclusion that an individual had knowing dominion and control over it.' " *United States v. Williams,* 952 F.2d 418, 420 (D.C.Cir.1991) (quoting *United States v. Foster,* 783 F.2d 1087, 1089 (D.C.Cir.1986)), *cert. denied,* —— U.S. ——, 113 S.Ct. 148, 121 L.Ed.2d 99 (1992). Those who spend considerable time in another's apartment, even those who "live" there, do not for that reason possess everything on the premises. No one would say, for instance, that Zeigler "possessed" Waite's spare clothing simply by knowing the contents of his dresser. The cocaine was locked in a briefcase in a locked room in someone else's apartment. The jury might have concluded that the occupants treated this as one apartment and that Zeigler crossed the invisible barrier in the hallway, freely moving from one side of the apartment to the other. Yet the government presented no evidence, circumstantial or direct, that Zeigler ever entered the laundry room or had the combination to the locks on its door or on the briefcase. When we look at the government's evidence and ask if "*any* rational trier of fact could have found the

essential elements of the crime beyond a reasonable doubt," *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Derr,* 990 F.2d 1330, 1337 (D.C.Cir.1993), the answer is no. Our cases go rather far in sustaining possession convictions of persons living on premises where drugs are found, *see United States v. Jenkins,* 928 F.2d at 1179; *United States v. Morris,* 977 F.2d 617, 620 (D.C.Cir.1992), but not so far as the government wants to take us in this case.

### B

■ The trial court therefore erred in denying Zeigler's motion for a judgment of acquittal made at the close of the government's case-in-chief. But this error does not in itself warrant reversing her conviction. Our *en banc* decision in *United States v. Foster,* 783 F.2d 1082, 1083 (D.C.Cir.1986), discarded the rule "that objection to denial of a motion for judgment of acquittal made at the close of the government's case-in-chief is not waived by the defendant's proceeding with the presentation of his evidence, so that the validity of an ensuing conviction must be judged on the basis of the government's initial evidence alone."

■ Zeigler's sufficiency claim therefore must be evaluated in light of all the evidence introduced at trial, including evidence the defense presented. *See also Byfield,* 928 F.2d at 1165–66. As to Zeigler's testimony, none of her answers, on direct or on cross-examination, assisted the prosecution's case. The government proposes that we look beyond her words, thereby raising the question discussed in Judge L. Hand's famous *Dyer v. MacDougall* opinion (201 F.2d 265 (2nd Cir. 1952)). *See Jenkins,* 928 F.2d at 1178–79.

*Dyer v. MacDougall* began as an action for libel and slander. The plaintiff's only witnesses would have been the two defendants. His plan was to call them to the stand, have them deny uttering the slanders, and hope the jury, in light of their demeanor, would believe the opposite of what they testified. Because in such event there could be no effective appellate review of a verdict in the plaintiff's favor, Judge Hand ruled for the

court that the defendants were entitled to summary judgment. To be sure, a witness's demeanor "is a part of the evidence." 201 F.2d at 269. The jury "may, and indeed they should," take it into consideration. *Id.* Demeanor evidence "may satisfy the tribunal, not only that the witness' testimony is not true, but that the truth is the opposite of his story; for the denial of one, who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies." *Id.; cf. NLRB v. Walton Mfg. Co.,* 369 U.S. 404, 406–08, 82 S.Ct. 853, 854–55, 7 L.Ed.2d 829 (1962). "He, who has seen and heard the 'demeanor' evidence, may have been right or wrong in thinking that it gave rational support to a verdict; yet, since that evidence has disappeared, it will be impossible for an appellate court to say which he was." *Id.* Thus, while it was "true that in strict theory a party having the affirmative might succeed in convincing a jury of the truth of his allegations in spite of the fact that all the witnesses denied them, we think it plain that a verdict would nevertheless have to be directed against him." *Id.*

■ Juries in criminal cases, like juries in civil actions, may and should take a witness's demeanor into account. Perhaps the jury here treated Zeigler's testimony, in light of her demeanor, in the manner described by Judge Hand. If it made "negative" inferences, these would have supplied enough evidence to convince any rational juror of her guilt beyond a reasonable doubt. Inferring the opposite of what she testified—as the government supposes the jury did—would mean that for months Zeigler had been living full-time with Waite in the apartment; that she ventured throughout the apartment; that she saw cocaine and guns in the apartment; that she knew of the laundry room, knew it was locked and knew who had the combina-

tion to the lock; and—most important—that *she* had the combinations to the locks on the briefcase containing the cocaine.

This raises an obvious problem. It is not only impossible to determine whether the jury made all or any of these negative inferences, but also impossible to judge whether it would have been justified in doing so. Jury deliberations are secret. Demeanor evidence is not captured by the transcript; when the witness steps down, it is gone forever. An appellate court cannot evaluate it, and therefore cannot determine how a rational juror might have treated it. The situation would be different if the defendant's testimony, on its face, were utterly inconsistent, incoherent, contradictory or implausible. Then an appellate court would have some assurance that when the defendant said "black" the jury reasonably could have concluded that the truth was "white." This may have been the situation as the plurality saw it in *Wright v. West,*[3] but it is not the situation here. Zeigler's testimony relating to the cocaine in the briefcase was hardly implausible.

Because we cannot evaluate demeanor, a decision along the lines the government proposes would mean that in cases in which defendants testify, the evidence invariably would be sufficient to sustain the conviction. We would in each such case assume the jury correctly evaluated the evidence. In explaining how this could be so in light of the defects in the government's proof, we would reason backwards to the only explanation available—the defendant's demeanor. This sort of approach, beginning with the hypothesis that the jury must have gotten things right, contradicts the reason why appellate courts review convictions for sufficiency of evidence—that juries sometimes get things wrong. *Jackson v. Virginia,* 443 U.S. at 317, 99 S.Ct. at 2788.

We have considered the possibility of a middle ground, of a rule such as this: when the government has presented at least *some*

---

**3.** —— U.S. ——, ——, 112 S.Ct. 2482, 2492, 120 L.Ed.2d 225 (1992). After quoting extensively from the cross-examination of the defendant, *id.,* —— U.S. at —— – ——, 112 S.Ct. at 2484–85 n. 1, the plurality opinion concluded that the jury could have considered defendant's testimony "perjured" and, if so, as affirmative evidence of

guilt. *Id.,* —— U.S. at ——, 112 S.Ct. at 2492. Of this there is no doubt. The issue we face is different: it concerns not the jury's prerogative, but the function of an appellate court reviewing the sufficiency of evidence to support a conviction.

evidence of guilt, an appellate court may add negative inferences from the defendant's testimony to sustain the conviction. The Second Circuit has rejected the idea: "Although [demeanor] is a legitimate factor for the jury to consider, this could not remedy a deficiency in the Government's proof if one existed." *United States v. Sliker*, 751 F.2d 477, 495 n. 11 (2d Cir.1984).[4] The Supreme Court rejected it in a denationalization case tried to a court. *Nishikawa v. Dulles*, 356 U.S. 129, 137, 78 S.Ct. 612, 617, 2 L.Ed.2d 659 (1958). There is no principled way of deciding when the government's proof, less than enough to sustain the conviction, is nevertheless enough to allow adding negative inferences from the defendant's testimony to fill the gaps. We cannot subscribe to the Seventh Circuit's analysis in *United States v. Zafiro*, 945 F.2d 881, 888 (1991), *aff'd on other grounds*, —— U.S. ——, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993),[5] which the plurality cited in *West*, —— U.S. at ——, 112 S.Ct. at 2492. *Zafiro* reasons that defendants will not take the stand if the government has offered no evidence of guilt: if the government has presented no evidence, the district court will quickly end the case by entering a judgment of acquittal. 945 F.2d at 888. Therefore, appeals presenting the *Dyer v. MacDougall* problem "are unlikely to occur" and the prospect of undermining appellate review should be of little concern. *Id.*[6] This of course assumes that district courts will not err. Also, *Zafiro* does

not answer the question before us—what does an appellate court do when the government has presented *some* evidence, but that evidence is itself insufficient to sustain the conviction, and the district court does not end the case? Such appeals, rare as the *Zafiro* court thought they may be, do occur. This is one of them. And it is one in which the defendant did decide to testify.

Only speculation supports Zeigler's conviction. We cannot determine whether Zeigler, by her demeanor on the stand, supplied the evidence needed to support her conviction. It is true that the traditional method of reviewing the sufficiency of evidence in criminal cases itself involves some speculation. We take the evidence in the light most favorable to the government, yet we cannot be sure the jury took it that way. But at least we draw inferences from the record. We do not begin and end on nothing more than a guess about what the jury might have observed at trial. Appellate review of the sufficiency of evidence protects against wrongful convictions. We refuse to destroy the protection in cases in which defendants testify.

*Reversed.*

---

4. We were too hasty in *Jenkins*, 928 F.2d at 1179, when we said that the Second Circuit takes demeanor evidence into account in determining whether there is sufficient evidence to support a conviction. The quotation in the text from *Sliker* is plainly to the contrary.

   In an earlier opinion, after saying that "a jury is free, on the basis of a witness' demeanor, to 'assume the truth of what he denies' although a court cannot allow a civil action, much less a criminal prosecution, to go to the jury on the basis of this alone," Judge Friendly, writing for the Second Circuit in *United States v. Marchand*, 564 F.2d 983, 986 (1977), *cert. denied*, 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760 (1978), reviewed the evidence and found it sufficient without relying on demeanor evidence. 564 F.2d at 999–1001. Judge Friendly followed the same approach in *United States v. Geaney*, 417 F.2d 1116, 1121 (2d Cir.1969): the government "having submitted substantial proof of Geaney's guilt, the judge could take into account the likelihood that in Judge L. Hand's well-known phrase [in

*Dyer v. MacDougall*], the jury would find 'not only that the witness' testimony is not true, but that the truth is the opposite of his story * * *.' " *See also United States v. Eisen*, 974 F.2d 246, 259 (2d Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1619, 123 L.Ed.2d 178 and —— U.S. ——, 113 S.Ct. 1840, 123 L.Ed.2d 467 (1993).

5. Or to the Ninth Circuit's in *United States v. Kenny*, 645 F.2d 1323, 1346 (9th Cir.), *cert. denied*, 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d 425 (1981).

6. *Zafiro* did not mention the Seventh Circuit's earlier decision, in a labor board case, holding that the findings of an administrative law judge could not be sustained on the basis that the ALJ must have believed "that the opposite of that to which [the witnesses] testified was true." *Roper Corp. v. NLRB*, 712 F.2d 306, 310 (7th Cir.1983). "[I]f such 'proof' were acceptable as sufficient evidence, effective review of fact-finding would involve analysis of a chimera." *Id.*