Faunett EVANS–REID, Appellant,

v.

**DISTRICT OF COLUMBIA,**
et al., Appellees.

No. 00–CV–1083.

District of Columbia Court of Appeals.

Argued March 30, 2004.
Decided July 12, 2007.

Kenneth Shepherd for appellant.

Michael F. Wasserman, Assistant Attorney General at the time of oral argument, with whom Robert J. Spagnoletti, Attorney General at the time the brief was filed, and Edward E. Schwab, Deputy Solicitor General, were on the brief, for appellees.

Before RUIZ, Associate Judge, and NEBEKER and TERRY,* Senior Judges.

RUIZ, Associate Judge:

This case arises from a shooting by a Metropolitan Police Department officer in the course of an investigatory stop of a vehicle, which, tragically, resulted in the death of a fourteen-year-old boy. The child's mother, Faunett Evans–Reid, filed a complaint for damages against the officer and the District of Columbia claiming negligence and assault and battery. On appeal, she challenges the trial court's entry of judgment as a matter of law dismissing her complaint. Appellant also contends that the trial court abused its discretion in

---

* Judge Terry was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on February 1, 2006.

excluding expert testimony and certain police reports. After reviewing the record and the parties' arguments, we conclude that the trial court's challenged evidentiary rulings were not an abuse of discretion and agree with the trial court that the evidence presented by appellant did not, as a matter of law, provide a sufficient basis from which the jury could have found that the officer's use of deadly force was unreasonable and returned a verdict in her favor. Therefore, we affirm the entry of judgment for appellees.

## I.

## BACKGROUND

On May 21, 1995, at approximately 7:00 p.m., fourteen-year-old Sean Evans was riding in the front passenger seat of a red Mazda that was being driven with the rear hatch-back door open. Upon reaching the intersection of Riggs Road and Chillum Place, N.E., the vehicle made a left turn on a red light. Two Metropolitan Police Department ("MPD") Officers, Officer Mark Green and Officer David Mosely, were separately patrolling the area at the time. They followed the red Mazda but did not give any direction to the driver to pull over. Officer Green, riding a motorcycle, followed the vehicle from behind, while Officer Mosely, who was driving a squad car, took another route to cut it off. After Officer Green followed the Mazda for less than two blocks, the car voluntarily came to a stop and parked at the curb. Officer Green stopped behind the Mazda, from where he observed that the front-seat passenger was making movements which caused the officer to suspect that a weapon was being concealed. Shortly thereafter, Officer Mosely came from the other direction and parked on the opposite side of the street. As both officers approached the vehicle, Officer Green used a verbal signal to indicate to Officer Mosely his suspicion that there might be a gun in the car. Officer Green approached the passenger's side of the vehicle while Officer Mosely approached the driver's side.

During his testimony, Officer Green explained that, because he suspected danger, he approached the car with his weapon drawn, holding it next to his hip and pointed at the ground. When he reached the passenger window, Officer Green saw Evans "lift up his shirt and pull out a gun." The weapon, which appeared to Officer Green to be a semi-automatic handgun, was pointed in his direction. Fearing for his life, Officer Green quickly raised his weapon and, holding it with both hands, fired in the direction of Evans's chest. Officer Green recounted that, as he fired, he stepped back while raising his gun, with his arm extended. Still afraid because the passenger's gun continued to be pointed at him, he then shot Evans a second time, this time in the head. According to Officer Green, Evans had a "cold" and "glazed type" or "glossy" look in his eyes.

As Officer Green approached the passenger, Officer Mosely had approached the driver. Officer Mosely testified that by the time he reached the car, the driver had already opened the door and placed his feet on the pavement, as if to get out, but was still seated in the car. He spoke to the driver and requested his license and car registration. Officer Mosely went to the rear of the car to compare the license plate number with the registration he had obtained from the driver. He then heard two shots before he had a chance to finish the comparison. Officer Mosely testified that as he approached the driver, he did not pay attention to the passenger, and later, when he was standing behind the car to compare the registration with the tag number, did not see any sudden movements by the passenger, did not see him hiding anything, and did not see him pull his shirt up or pull a gun from his waist

and point it at Officer Green. Altogether, he believed that "a dozen or more seconds" passed from the time Officer Mosely stopped his car across from the Mazda until the shooting took place. After the shots were fired, the driver jumped down on the ground. After restraining the driver with handcuffs as a precautionary measure, Officer Mosely looked up and saw Officer Green "standing on the passenger side of the car ... just looking distraught ... almost like he [had] seen a ghost ... [f]rightened." He also looked at the passenger inside the car and saw that he was bleeding profusely and had a gun in his left hand. The gun, as it turned out, was a BB gun. Except for the two officers, no eyewitness to the shooting testified at trial.[1]

The medical examiner who conducted the autopsy determined that Sean Evans died from gunshot wounds to the face and chest. According to the forensic expert, Dr. Jonathan Arden, stippling around the wound to the head indicated that the shot was fired from a distance of approximately twelve inches.[2] Tests conducted at the time also revealed that Evans's blood alcohol level was 0.11 percent, in the "intoxicated" range. The forensic expert testified that, at such a level, a person would be "significantly" and "visibly" intoxicated, his judgment and reflexes could be impaired, and his usual inhibitions and mood altered.

Evans's mother (appellant) took the stand. She testified that her son was right-handed, calling into question that he would have drawn and pointed a gun at Officer Green with his left hand. Testimony and pictures of the car showed that the door handle was missing from inside the front passenger door. A photograph also showed a shell casing in the Mazda's roof gutter.[3]

## II.

## DISCUSSION

### A. Exclusion of Expert Witness

Appellant argues that the trial court abused its discretion in excluding the expert testimony of Commander Winfred Stanley based on the fact that Commander Stanley lacked experience on the national standard of care for conducting traffic stops and had local experience only.

"The admission of expert testimony is committed to the broad discretion of the trial court and a ruling either admitting or excluding such evidence will not be disturbed unless 'manifestly erroneous.'" *Dyas v. United States*, 376 A.2d 827, 831 (D.C.1977) (quoting *Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962)). In *Dyas*, this court set forth a three-part test for the admission of expert testimony: (1) the subject matter "must be so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman"; (2) "the witness must have sufficient skill, knowledge, or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth"; and (3) "the state of the pertinent art or scientific knowledge [must] permit a reasonable opinion to be asserted." *Dyas*, 376 A.2d at 832 (quoting MCCORMICK ON EVIDENCE § 13, at 29–31 (E.Cleary, 2d ed.1972)). Where expert testimony is necessary, "the expert must clearly articulate and reference a standard of care by which

---

1. The driver did not testify.

2. According to the expert, Dr. Arden, "eighteen inches is pushing the outer limit. Six is very much pushing the inner limit."

3. There was no expert testimony, however, to explain the significance of this.

the defendant's actions can be measured." *Clark v. District of Columbia,* 708 A.2d 632, 635 (D.C.1997) (quoting *Messina v. District of Columbia,* 663 A.2d 535, 538 (D.C.1995)). The standard of care is to be found in "the practices in fact generally followed by other comparable governmental facilities" or some nationally-recognized standard. *Id.; see also Toy v. District of Columbia,* 549 A.2d 1, 7–8 (D.C.1988) (noting that plaintiff's expert in suicide case "did not provide any basis for his opinion that national standards required the District to have oxygen and other emergency equipment available").

■ Appellant argues that Commander Stanley's testimony during *voir dire* demonstrated that he was qualified to serve as an expert witness on police procedures and the national standard governing police conduct in this case. In support of her argument, appellant asserts that, in addition to his twenty-one years of experience with the Metropolitan Police Department, Commander Stanley participated in numerous in-service programs and traveled to other jurisdictions to study police patrol activities. Moreover, appellant contends, Commander Stanley studied the literature on police administration and testified that he was familiar with national standards concerning police traffic stop practices including the Commission on Accreditation of Law Enforcement Agencies (CALEA), which accredits hundreds of law enforcement agencies across the country. As proof of his qualifications, appellant asserts that Commander Stanley had previously been qualified as an expert on police procedures in the Superior Court of the District of Columbia.[4]

We perceive no abuse of discretion in the trial court's determination that Commander Stanley lacked the necessary expertise to opine on the national standard. As the trial court explained, "[h]is expertise is local. He's only relying on the single national standard. It has nothing to do with the conduct of a traffic stop and so he isn't an expert and cannot give expert testimony on conduct of a traffic stop." Because the record confirms that the single national standard proffered by Commander Stanley (CALEA) did not provide guidelines for a police officer's conduct during a traffic stop,[5] it was inadequate to establish the national standard of care by which a trier of fact could measure the specific conduct at issue in this case, the use of deadly force while conducting an investigatory traffic stop. *See District of Columbia v. Carmichael,* 577 A.2d 312, 316 (D.C.1990).

## B. Judgment as a Matter of Law

■ Judgment as a matter of law (sometimes referred to as a directed verdict) is proper "if during a trial by jury [the plaintiff] has been fully heard on an issue, and there is no legally sufficient evidentiary basis for a reasonable jury to find for [her]." *Burke v. Md. Auto Ins. Fund,* 879 A.2d 996, 996 n. 1 (D.C.2005) (quoting Super. Ct. Civ. R. 50(a)(1)). Accordingly, "[a] verdict may be directed only if it is clear that [the plaintiff] has not established a *prima facie* case." *Haynesworth v. D.H. Stevens Co.,* 645 A.2d 1095, 1097 (D.C.1994) (internal quotations and citations omitted). However, since the trial court is not the trier of fact in a jury trial, it "must take care to avoid weighing the evidence, passing on the credibility of witnesses, or substituting its judgment for that of the jury." *Abebe v. Benitez,* 667

---

4. Commander Stanley stated that he had testified as an expert once before in a civil case involving a pedestrian stop and that the incident did not involve a shooting.

5. In addition, it appears that CALEA standards have been adopted in fewer than five percent of the jurisdictions nationwide.

A.2d 834, 836 (D.C.1995) (internal quotations and citations omitted). "[I]n reviewing a directed verdict, we view the facts, as the trial court was required to, in the light most favorable to [the plaintiff]" because the jury could have so credited her evidence. *Haynesworth*, 645 A.2d at 1097 (internal quotations and citations omitted).

▇▇▇ "When an individual is shot by a District of Columbia police officer, and he or his successors in interest decide to bring a lawsuit, they may proceed under one or more different common law theories of legal liability." *Holder v. District of Columbia*, 700 A.2d 738, 741–42 (D.C.1997) (citing *Etheredge v. District of Columbia*, 635 A.2d 908, 916 (D.C.1993)). "For example, they may sue for the common law intentional torts of assault and battery." *Id.; District of Columbia v. White*, 442 A.2d 159, 162–64 (D.C.1982); *District of Columbia v. Downs*, 357 A.2d 857, 859–60 (D.C.1976). Suit may also be predicated upon one or more theories of negligence, including the officer's negligent act of shooting the victim. *See District of Columbia v. Evans*, 644 A.2d 1008, 1019–21 (D.C.1994); *Etheredge*, 635 A.2d at 917–18; *White*, 442 A.2d at 162–64; *District of Columbia v. Davis*, 386 A.2d 1195, 1198 (D.C.1978); *Downs*, 357 A.2d at 859–60. The District is vicariously liable for the intentional and negligent acts of its officers acting within the scope of their employment. *See White*, 442 A.2d at 162 n. 7 (citing *Davis*, 386 A.2d at 1202).[6]

▇▇▇ An assault is "an intentional and unlawful attempt or threat, either by words or by acts, to do physical harm to the victim." *Etheredge*, 635 A.2d at 916. "A battery is an intentional act that causes a harmful or offensive bodily contact." *Id.* (quoting *Jackson v. District of Columbia*, 412 A.2d 948, 955 (D.C.1980) (citing RESTATEMENT (SECOND) OF TORTS § 18 (1965))). As in most cases involving intentional shootings by police officers, there was ample evidence to satisfy the elements of the tort of assault and battery, and the issue of liability turns on the defense of privilege:

> A police officer has a qualified privilege to use reasonable force to effect an arrest, provided that the means employed are not in excess of those which the actor reasonably believes to be necessary. Moreover, any person, including an officer, is justified in using reasonable force to repel an actual assault, or if he reasonably believes he is in danger of bodily harm. *Use of "deadly force," however, is lawful only if the user actually and reasonably believes, at the time such force is used, that he or she (or a third person) is in imminent peril of death or serious bodily harm.*

*Id.* (internal quotations and citations omitted) (emphasis added).

▇▇▇ Appellant contends that the trial court erred in concluding that she failed to present evidence from which the jury could find that Officer Green did not have a reasonable belief that he was in imminent peril of death or serious bodily harm when he shot her son. Specifically, appellant asserts that the trial court was incorrect in its view that appellant had the

---

**6.** As noted, appellant's complaint included a negligence claim. In order to prevail in a negligence action, the plaintiff must prove "the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury." *Etheredge*, 635 A.2d at 917 (quoting *Toy*, 549 A.2d at 6 (quoting *Meek v. Shepard*, 484 A.2d 579, 581 (D.C.

1984))). Because the standard of care in cases of this kind is beyond the ken of the average lay juror, expert testimony is required. *See id.* As already discussed, the trial court properly excluded appellant's proffered expert. Without an expert, appellant's negligence claim could not be sustained, and the District was entitled to judgment on that claim.

burden to prove that her son was unarmed when he was shot by Officer Green.[7] In addition, appellant argues, the trial court erred in concluding that the circumstantial evidence she presented was insufficient to allow the trier of fact to draw reasonable inferences that Officer Green had an alternative motive (other than fear for his own safety) to shoot Sean Evans and that Officer Mosely had the opportunity to plant the weapon recovered from the car in order to provide a justification for the shooting.

 "[T]he inquiry involved in a ruling on a motion for [judgment as a matter of law] necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "If the defendant in a run-of-the-mill civil case moves ... for a directed verdict ... the judge must ask himself ... whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Id.* "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* In short, appellant's showing must meet the preponderance of the evidence standard.[8]

Appellant argues that once she presented a *prima facie* case that Officer Green intentionally shot her son (*i.e.*, assault and battery), *see Holder*, 700 A.2d at 741, the burden shifted to the government to prove Officer Green's defense of privilege to use deadly force. *See Karnes v. Skrutski*, 62 F.3d 485, 490–91 (3d Cir.1995). We will assume, without deciding, that where a plaintiff establishes a *prima facie* case of assault and battery and the officer invokes the qualified privilege as an affirmative defense, the officer bears the burdens of production and persuasion.[9] On that assumption, to meet its burden the government had to show that Officer Green actually believed that he was in imminent danger of death or serious bodily harm when he used deadly force against Sean Evans and that his belief was reasonable under the circumstances. *See Holder*, 700 A.2d at 741. In the context of this case, that meant showing either that Evans was armed and posed an actual threat to Officer Green, or that, even if he was not, Officer Green could reasonably have believed that Sean Evans was armed and dangerous. Officer

---

7. According to the record, the trial court's statement was not as narrow as appellant suggests:

> [Counsel]:—it appears that what the Court is telling us is that we did not do and should have done is that we did not prove sufficiently that Shawn [sic] did not have a gun in his hand.
>
> [The Court]: Well, stated a little differently, you have the burden of proving an unjustified shooting or the use of excessive force by Officer Green. Not technically that Shawn [sic] was unarmed, but because your theory is that Officer Green shot him while he was unarmed, that would be proof that the shooting was unjustified and that excessive force had been used.
>
> But it wouldn't matter how you proved that the shooting was a result of excessive force so long as you prove that.

8. The same standard applies in the context of a motion for summary judgment. "The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505.

9. We have "specifically left open the question of who bears the burden on the privilege issue." *See District of Columbia v. Chinn*, 839 A.2d 701, 706 n. 3 (D.C.2003) (citing *Jackson*, 810 A.2d at 395 n. 15); *Kotsch v. District of Columbia*, 924 A.2d 1040, 1047–50 (2007). We need not decide who bears the burdens of production and persuasion in this case because, as discussed below, we conclude as a matter of law that the government has met both burdens.

Green's testimony, if believed by the jury, met this burden, for he testified at trial that he shot Evans because, upon reaching the passenger side of the vehicle, he feared for his life when he saw Evans take a semi-automatic gun from his waistband and point it at him.[10]

Of course, the jury did not have to believe Officer Green's testimony. Here, appellant contends, the jury could have rejected the claim of privilege by drawing several inferences in her favor from the evidence presented at trial. Specifically, appellant asserts that a jury could infer from the evidence that Officer Mosely was in a position to observe whether Sean Evans had a weapon or made any sudden movements to point a weapon at Officer Green when Mosely initially approached the driver's side of the vehicle or when he was standing behind the car comparing the registration card with the license plate. Appellant asserts that from Officer Mosely's testimony that he did not see a weapon at either time, a jury could reasonably infer that Sean Evans was not armed and, therefore, did not pose a serious threat to Officer Green. The record shows, however, that Officer Mosely testified that he was not paying attention to the passenger when he approached the vehicle and that he was focused on the license plate when he heard shots being fired. More importantly, Officer Mosely also testified that

after arresting the driver outside the driver's door of the Mazda, he looked into the car and saw Sean Evans bleeding and holding a weapon in his left hand. Given this testimony, the jury could not *reasonably* infer that Sean Evans was unarmed based only on that portion of Officer Mosely's testimony that he did not see a weapon when he initially approached the vehicle.

■ Appellant also contends that a jury could infer from the evidence not only that Officer Mosely did not see Sean Evans holding a gun, but also that he planted the gun that was recovered from the car. In support of her argument, appellant points to evidence presented at trial that, approximately two years before the shooting, Officer Mosely had been seen in possession of an "unauthorized gun"[11] that fell from his briefcase while he was standing in line at the check-out window of a police station. Appellant contends that from this evidence a jury could reasonably infer that Officer Mosely had access to a "throw down" weapon[12] and that he used it on the day of the shooting in order to provide a justification for Officer Green's use of deadly force. At trial, Officer Mosely testified that the "unauthorized gun" he had been seen with at the police check-out window was a "starter pistol" (an inoffensive cap gun) and not a BB gun.[13] The "starter pistol" Officer Mosely claimed as his was introduced into evi-

10. Tragically, in this case the gun that was found in Evans's left hand after he was shot turned out to be a BB gun unlikely to inflict serious injury to Officer Green, a fact that an experienced officer would have known—and would have undermined a defense of qualified privilege—if the officer had perceived it to be a relatively inoffensive BB gun. The testimony at trial, however, was that the BB gun "[l]ooked like a semi automatic handgun," such that the officer could have nonetheless been in reasonable (although mistaken) fear for his life. *See Holder,* 700 A.2d at 741. That would not have been the case if the BB gun had easily been recognized for what it was.

11. An "unauthorized gun," as used by appellant, refers to a gun that an officer does not possess in the course of his official duties and is not traceable to him.

12. A "throw down" gun is used to refer to a weapon—*e.g.,* an "unauthorized gun"—that can be used ("planted") to incriminate a suspect.

13. Officer Mosely was impeached on this point by a statement he had made to investigators of the MPD Internal Affairs Division that he recalled being questioned about a "BB gun or starter gun I had in my ... briefcase."

dence, as was the gun found in Evans's hand after he was shot. Obviously they were not one and the same gun, and if Officer Mosely were believed that his "unauthorized gun" was not the BB gun, but the starter pistol, appellant's theory would be rejected by the jury. In order to impeach Officer Mosely, appellant presented testimony from officers who witnessed the incident at the police station check-out window in an effort to establish that Officer Mosely's "unauthorized gun" was not the starter pistol as Mosely claimed, but the gun found in Evans's hand. Appellant offered no further evidence that would support a reasonable inference that the gun recovered from the car was Officer Mosely's gun or that it was, in fact, planted by Officer Mosely on the day her son was shot. Appellant's theory was sound, but the testimony needed to support it did not, unfortunately for her claim, materialize to bridge the gap identified by the trial court that there was insufficient evidence linking the two guns.[14] As a result, evidence of Officer Mosely's dropped gun two years earlier, though relevant, is of tenuous probative value and insufficient by itself to permit a jury reasonably to infer that the gun found inside the car came from Officer Mosely. *Cf. Webster v. City of Houston*, 735 F.2d 838, 843 (5th Cir. 1984) (Williams, J., dissenting) (eyewitness testimony and federal investigation tracing gun to police property room established that police officers had planted a "throw down" weapon to cover up unjustified shooting of unarmed driver).

▬▬▬ Finally, appellant argues that the case should have gone to the jury

because if the jurors thought the officers lacked credibility and had a motive to offer false testimony, they could have inferred that what occurred was the *opposite* of what the officers testified to, *i.e.*, that Sean Evans was, in fact, unarmed and never posed a threat to Officer Green. Specifically, appellant points to the officers' evasiveness, contradictory testimony and bias. The Supreme Court has stated, however, that "[w]hen the testimony of a witness is not believed, the trier of fact may simply disregard it. Normally the discredited testimony is not considered a sufficient basis for drawing a contrary conclusion." *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 512, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (holding in a defamation case that witness's steadfast misrepresentation and rationalization is insufficient to prove malice by clear and convincing evidence). "Instead, the plaintiff must present affirmative evidence in order to defeat a properly supported motion for [judgment as a matter of law]." *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505. We have similarly said that "[m]ere disbelief of evidence is not a valid basis for inferring that the opposite is true." *Group Hospitalization, Inc. v. D.C. Comm'n on Human Rights*, 380 A.2d 170, 174 (D.C.1977). Most courts of appeals agree that a jury may not use the disbelief of a witness's testimony as exclusive proof of a fact of an opposite nature or tendency. Most notably, Judge Learned Hand addressed this issue in *Dyer v. MacDougall*, 201 F.2d 265 (2d Cir.1952), reasoning that although a witness's demeanor alone may rationally justify a finding opposite to the

---

**14.** There were no fingerprints—Mosely's or Evans's—recovered from the gun. Lt. Perseaud and Officer Conrad gave equivocal testimony about whether the unauthorized gun they had seen at the police station resembled the gun recovered after the shooting, or was more similar to the starter pistol Officer Mosely produced at trial. Although Officer

Conrad said the gun found in the car at the time of the shooting looked like Officer Mosely's unauthorized gun, he also testified, as the trial court noted, that the gun Officer Mosely had was a revolver whereas the one found at the shooting was an automatic or semiautomatic pistol.

witness's testimony in court, the theory would not be countenanced on the policy ground that there could be no effective appellate review of a trial judge's decision to permit an issue to go to the jury on the basis of witness demeanor alone. In Judge Learned Hand's words: "although it is ... true that in strict theory a party having the affirmative might succeed in convincing a jury of the truth of his allegations in spite of the fact that all the witnesses denied them, we think it plain that a verdict would nevertheless have to be directed against him." *Id.* at 269.[15] In the criminal context, in *Hector v. United States*, 883 A.2d 129 (D.C.2005), we rejected the argument that the government could rely on the jury's disbelief of the defendant's testimony to draw a "powerful, negative inference" of guilt sufficient to sustain a conviction in the absence of affirmative evidence contradicting the defendant. *Id.* at 133–34; *see also United States v. Zeigler*, 301 U.S.App. D.C. 298, 302, 994 F.2d 845, 849 (1993) (describing the notion as absurd where the testimony is not "on its face, ... utterly inconsistent, incoherent, contradictory or implausible"). We, therefore, agree with the trial court that the evidence that was admitted—even when viewed favorably to appellant—did not suffice for a jury to find for her without engaging in speculation.[16]

■ We think, however, that a different result might have obtained if there were evidence from which the jury could infer that the officers were motivated by racial bias, particularly in a civil trial where the plaintiff's burden is a preponderance of the evidence. *Cf. Anderson*, 477 U.S. at 244, 106 S.Ct. 2505 (applying clear and convincing standard under *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)); *Bose Corp.*, 466 U.S. at 487, 466 U.S. 485 (same); *Hector*, 883 A.2d at 134 (criminal

---

15. *See also Moore v. Chesapeake & O Ry. Co.*, 340 U.S. 573, 576, 71 S.Ct. 428, 95 L.Ed. 547 (1951); *Martin v. Citibank, N.A.*, 762 F.2d 212, 217 (2d Cir.1985); *Collman v. Comm'r*, 511 F.2d 1263, 1268 (9th Cir.) (1975); *Kenneth E. Curran, Inc. v. Salvucci*, 426 F.2d 920, 923 (1st Cir.1970); *Fed. Ins. Co. v. Summers*, 403 F.2d 971, 974 (1st Cir.1968); *Janigan v. Taylor*, 344 F.2d 781, 784 (1st Cir.1965); *Mandelbaum v. United States*, 251 F.2d 748, 752 (2d Cir.1958); *Mosson v. Liberty Fast Freight Co.*, 124 F.2d 448, 450 (2d Cir.1942) (Hand, J.); *Pariso v. Towse*, 45 F.2d 962, 964 (2d Cir.1930) (Hand, J.); *Dworkis v. Dworkis*, 111 So.2d 70, 74 (Fla.App.1959); *New Orleans & N.E.R. Co. v. Redmann*, 28 So.2d 303, 309 (La.App.Orleans1946); *Michigan Employment Relations Comm'n v. Cafana Cleaners, Inc.*, 73 Mich.App. 752, 761, 252 N.W.2d 536, 540 (1977); *Moulton v. Moulton*, 178 Minn. 568, 569, 227 N.W. 896, 897 (1929); *Allstate Ins. Co. v. Page*, 105 N.H. 410, 413, 200 A.2d 851, 853 (1964); *Clairmont v. Cilley*, 85 N.H. 1, 7, 153 A. 465, 468 (1931); *Briscoe v. Laminack Tire Serv.*, 546 S.W.2d 695, 697 (Tex.Civ.App.1977); *Chapman v. Troy Laundry Co.*, 87 Utah 15, 32–33, 47 P.2d 1054, 1062 (1935).

16. Appellant also argues that the forensic expert's testimony about the likely range of 12 inches from which the second shot (to the head) was fired, permitted the jury to infer that the first shot was a "contact shot" up against Evans's chest because Officer Green testified that he stepped back before he fired the second shot. From this, according to appellant, the jury could reject Officer Green's testimony that he was about two and a half to three feet from Evans when he fired the first shot, and, further, infer that he did not shoot Evans out of fear for his life. We note, however, that Officer Green testified that he was holding the gun with both hands and had his arms extended when he fired, and then took a step "a little bit further back," which would account for the expert's opinion based on the stippling around the head wound. Moreover, the jury's rejection of Officer Green's assessment of the exact location from which the shots were fired would not necessarily negate that the use of force was justified if Evans was pointing a gun in Officer Green's direction. Appellant's argument would impermissibly allow a very speculative conclusion.

burden of establishing proof beyond a reasonable doubt); *Zeigler,* 301 U.S.App. D.C. at 301, 994 F.2d at 848 (same). Bias, in the sense of animus against the claimant, can be used to infer motivation to commit the ultimate injurious act that gives rise to liability sufficient to carry the plaintiff's burden. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (stating that "rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination"); *see also Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) quoting (*St. Mary's Honor Ctr.,* 509 U.S. at 511, 113 S.Ct. 2742) ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the *prima facie* case, suffice to show intentional discrimination."); *United States v. Eisen,* 974 F.2d 246, 262 (2d Cir.1992) ("noting that if a plaintiff presented independent evidence that supported its case, the *Dyer* rule would not necessarily apply."); *NLRB v. Joseph Antell, Inc.,* 358 F.2d 880, 883 (1st Cir.1966) ("The mere disbelief of testimony of itself establishes

nothing. Affirmative proof, however, that the reason given [for the discharge] was false · warrants the inference that some other reason was being concealed. If the employer is independently shown to have an antiunion animus which the discharge would gratify, it may be a fair inference that this was the true reason.") (citations omitted).

Appellant's argument to the jury would have been that the shooting of Evans was not only not justified, and not a miscalculation, but an intentional act fueled by the officers' desire to "get" a black man.[17] To prove this racial motivation, appellant sought to introduce as substantive evidence a number of reports, consisting of interviews of various officers conducted by the MPD Internal Affairs Division after the shooting of Evans.[18] These IAD reports raise immensely troubling allegations that—if there were an evidentiary basis for their admission—would have been relevant to the jury's consideration, and along with disbelief of the officers, could have provided a sufficient basis to allow the jury to decide the truth of the accusation that the officers fabricated their story and planted the weapon to cover up an unjustified shooting. We, therefore, review the trial judge's exclusion of the IAD reports.[19]

17. Appellant painted a scene where the driver had stopped the car of his own accord and that he and Evans were about to exit from the vehicle when the officers approached with their evil purpose. Because the inside handle of the passenger door was broken (as shown by a photograph admitted into evidence), Evans had innocently turned to face the window in order to reach around with his left hand to open the door using the outside handle. This would account for the bullet wounds to the middle of his chest and face.

18. These interviews consisted of statements made to the interviewees or conversations overheard by the interviewees that alleged that Officers Green and Mosely were racially motivated to select black men to harass and, worse, to shoot them. Among the sickening

details in the reports is that they discussed the shooting immediately before Evans was killed, and then planned to hold a party at which a congratulatory card would be presented with the "image of a black person" to "celebrate" the shooting of Evans.

19. In its brief and during oral argument, the District maintained that the transcript of the trial judge's oral ruling was not part of the record on appeal and thus, appellant had not met her "duty to present this court with a record sufficient to show affirmatively that error occurred." *Robinson v. Howard Univ.,* 455 A.2d 1363, 1370 (D.C.1983) (citation omitted). As a result, argued the District, we could not "base our review of errors upon statements ... which are unsupported by that record." *Cobb v. Standard Drug Co.,* 453 A.2d

## C. Exclusion of the IAD Reports

The trial judge did not admit the reports as substantive evidence during the appellant's case in chief.[20] She explained that the reports contained "double hearsay." In some cases, in fact, it was multiple hearsay: the first level of hearsay being the report writer, the second level being the person interviewed, and then the persons whose statements the interviewee described to the report writer. Appellant argues that the first level of hearsay came within the exception for business records kept by the police department in the regular course of an internal investigation, see Super. Ct. Civ. R. 43–I; *Montgomery v.*

110, 112 (D.C.1982). Relying on appellant's failure to supply a sufficient record and the presumption of regularity, the District did not address the evidentiary claim on the merits. For his part, appellant's counsel, in response to questioning at oral argument, said that the court had given little or no reason for excluding the IAD reports. As it turns out, neither one is entirely correct. Although the record on appeal does not contain the District's motion in limine to exclude the IAD reports nor the trial judge's final oral ruling, a copy of appellant's opposition (though not listed in the Designation of Record) is included in the appendix appellant filed with the court and a transcript containing at least part of the trial court's reasoning is part of the record on appeal. *See* Supp. R # 4 (containing transcript of June 21 and 22, 2000).

The IAD reports (appellant's exhibits 15–27) were not admitted into evidence and were not listed in the Designation of Record. The transcript indicates, however, that the trial court suggested to counsel that, to preserve them for appellate review, counsel should present them directly to this court. Appellant has included the reports in the appendix filed with this court. Although this was not the proper procedure at the time, in view of the trial court's direction to counsel, we treat them as part of the record on appeal as it is apparent from the transcript that the trial judge had the reports and knew what was in them. The District does not contend that the reports in the appendix are not the ones that were presented to the judge at trial. We, therefore, take note of the reports and their content in assessing appellant's claim of trial court error.

**20.** The trial judge did permit Officer Mosely to be questioned about the allegations in the reports, but only for purposes of impeachment, *see Brooks v. United States*, 448 A.2d 253, 259 (D.C.1982), as they were not admissions of a party-opponent. (Appellant's motion to amend the complaint to add Officer Mosely as a defendant was denied as time-

barred, a ruling appellant does not challenge.) Sgt. Brian Murphy, one of the officers interviewed by IAD, testified at trial about a conversation he said he had with Officer Mosely at the courthouse shortly after the shooting. In that conversation, according to Sgt. Murphy, Officer Mosely recounted that prior to the shooting, he and Officer Green had been talking about "getting into a shooting" and that, immediately after the shooting, Officer Green had "like a smirk on his face" and told Officer Mosely, "I told you I was going to get one of them." Sgt. Murphy also recounted that a few days later, Officer Mosely asked him whether he was going to attend a party for Officer Green on June 3rd, to be held at another officer's house, "in celebration of the shooting" and that Officer Green would be given a card saying "something to the effect of congratulations on your first shooting." Sgt. Murphy acknowledged that he had no personal knowledge of the facts, apart from what Officer Mosely had told him. He also was impeached for bias resulting from Officer Green's having teased him about a previous DUI charge and "the crime of sleeping with his daughter." A limiting instruction was given to the jury cautioning that Sgt. Murphy's testimony about what Officer Mosely told him was not "proof that Officer Green said any of these things or did any of these things."

Officer Mosely, on the other hand, reiterated that he and Officer Green had conducted a routine stop for traffic violations. He denied having talked to Sgt. Murphy at all and also denied each of the allegations Murphy had made. He (as well as Officer Green) explained that the supposed "party" for Officer Green was no more than a gathering at Officer Green's house—that had been planned before the shooting—so that several officers could help Officer Green fix up his house prior to sale. Officer Mosely's testimony was generally consistent with the interview he gave during the IAD investigation.

*United States*, 517 A.2d 313, 316 (D.C. 1986) (admitting PD–775 representing officer's factual observations as a business record generally kept in the course of business), and that the others were admissible under the "state of mind" exception to the hearsay rule because the evidence was not being introduced to prove as a fact that the officers planned the shooting or held a party to celebrate it, but to show that they acted with a racially-motivated state of mind.

▬▬▬ We disagree with appellant that the reports could overcome the multiple hearsay objection noted by the trial court. It has long been established that "a police report of [an] accident is not to be admitted [under the business records exception] if it contains hearsay or conjecture or conclusions. Statements in a police report which are based on what the officer was told by others are just as much hearsay as if stated on the witness stand by the officer himself. Likewise inadmissible are conclusions and conjectures by the officer as to fault or lack of fault...." *Levin v. Green*, 106 A.2d 136, 138 (D.C. 1954). It is imperative to keep in mind that two inquiries must be made about business records: whether the record itself qualifies under the exception, and whether any statement in the record is itself hearsay that is not covered by an exception to the hearsay rule. *See United States v. Smith*, 172 U.S.App.D.C. 297, 305, 521 F.2d 957, 965 (1975) (noting that PD–251 was admissible as a business record but only to impeach the declarant's trial testimony, not as substantive evidence of the declarant's statement of the facts recorded in the police report).[21]

▬▬▬ Even if the first level of hearsay objection could be hurdled under the business records exception, the second and third levels of hearsay—the statements of the interviewees and the conversations that the interviewees reported—would not qualify for the state of mind exception urged by appellant.[22] The state of mind exception permits the use of hearsay statements for the limited purpose of showing the state of mind of the declarant, *see Clark v. United States*, 412 A.2d 21, 28–30 (D.C.1980), or of the listener, including motive, *see In re C.D.*, 437 A.2d 171, 175 (D.C.1981), but does not permit the fact finder to consider the statement for its truth. "If [the officers'] ... state of mind

21. The IAD reports were part of a criminal investigation, which resulted in no charges against the officers. A record will not come within the business records exception if it is prepared in anticipation of litigation. *See Montgomery*, 517 A.2d at 316 (noting that PD–775 was not kept for such purpose). We need not decide whether the IAD reports satisfy the requirements for admission as business records if they were prepared (at least in part) in anticipation of litigation because the reports consisted of statements made by others and conversations overheard by the interviewees, which were themselves hearsay statements.

Nor do we think that the IAD reports would have been admissible under the exception for *public* records and reports that contain "factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." FED.R.EVID. 803(8). *See Bowman v. Redding & Co.*, 145 U.S.App.D.C. 294, 299, 449 F.2d 956, 961 (1971) (in wrongful death action parts of autopsy report—required by law—that went beyond "anatomical diagnosis" and included history of how accident leading to death occurred were excluded as hearsay). The IAD reports make no independent fact findings—they merely record interviews—and are replete with hearsay statements.

22. There is also no merit to appellant's contention that the hearsay statements during the investigatory interviews recorded in the reports that were conducted some time after the shooting, come within the exceptions for excited utterances and present sense impressions. *See Hallums v. United States*, 841 A.2d 1270, 1276–79 (D.C.2004).

... is to be shown by a mere assertion of past conduct ... then the jury in effect must believe that the past act occurred.... In other words, the hearsay must be accepted for its truth if it is to provide a basis for evaluating the declarant's state of mind. Hearsay evidence which is otherwise inadmissible cannot be bootstrapped to a recognized ... exception in this manner." *Giles v. United States*, 432 A.2d 739, 745–46 (D.C.1981). Here, in order to make the inference appellant would urge—that the officers were motivated by racial animus—the jury would first have to find that the officers in fact said and did what the hearsay statements indicated, *i.e.*, they would have to be persuaded that what was asserted in the interviews contained in the IAD reports was true. None of the declarants whose statements (or purported statements) are included in the reports, however, was a firsthand observer of the comments and events they recounted. Thus, the trial judge did not abuse discretion in excluding the reports as hearsay, particularly given the highly inflammatory content of the reports. *See United States v. Brown*, 160 U.S.App. D.C. 190, 206, 490 F.2d 758, 774 (1973) (noting with respect to admission of

decedent's hearsay statement under state of mind exception, that "even where there is substantial relevance, the additional factual matters in the statement may simply be too explosive to be contained by the limiting instruction, in which case exclusion of the testimony is also necessitated").[23]

\* \* \*

We conclude that while the jury could well have drawn negative inferences from its disbelief of the officers' testimony, as a matter of law such inferences are insufficient, without more, to rebut the appellees' proof by a preponderance of the evidence. Even assuming—as we must—that the jury could have rejected the claim of privilege based on the evidence in the IAD reports, had they been admissible, the trial judge did not abuse discretion in excluding them. As there is no evidence from which the jury could reasonably make inferences to rebut appellees' defense of privilege, judgment as a matter of law was proper. *See Eisen*, 974 F.2d at 262 & n. 6.

*Affirmed.*[24]

---

**23.** Appellant also argues that the court should have granted her motion to amend the complaint to add a claim under 42 U.S.C. § 1983, which she filed upon receiving from the District the reports of the MPD's Internal Affairs Division. As we conclude that the reports were properly excluded, any error in denying the motion to amend the complaint would have been harmless. As the evidence admitted is insufficient to overcome the defense of privilege to a claim of assault and battery, it would be similarly insufficient in the context of an immunity defense to a constitutional claim. *See Kotsch, supra* note 5, 924 A.2d at 1047, n. 7 (2007); *Etheredge*, 635 A.2d at 916 n. 10.

**24.** Appellant's counsel has recently filed motions to disqualify the division and, indeed, the entire court, from deciding this appeal, on

the ground that the court's delay in deciding the appeal has invested it with an interest in how it decides the case, and that the court is seeking to protect the District government from liability to appellant. The court regrets the delay and is cognizant of the appellant's personal and emotional investment in this difficult case. The court, however, is independent of the other branches of District government and its judges are bound to uphold the independence of the judiciary, as is shown by the substance of our reasoning in this opinion. There is no merit to counsel's argument, and those motions are denied.

Appellant's counsel has also recently filed a motion to vacate all of the trial judge's rulings, orders and judgment in this case "as a nullity due to structural defect." We note that, in the trial court, counsel also sought to disqualify the trial judge. On appeal he has

not challenged the trial court's denial of his motion. In this latest effort, counsel relies on a July 15, 2005 "Determination and Undertaking" of the District of Columbia Disabilities and Tenure Commission that the trial judge's conduct during a traffic stop on March 6, 2005 "fairly gave the appearance of an attempt to lend the prestige of her office to advance her private interests, that is, to gain the personal advantage of deferential treatment, and that her conduct was of a sort that erodes public confidence in the judiciary." According to the Commission, the trial judge made comments to the police officers who stopped her "which were reasonably understood to suggest that, as a judge, she was entitled to 'professional courtesy' from the police." The Commission noted that the trial judge had "accept[ed] the Commission's determinations and conclusions ..., recognize[d] that her conduct in this instance had the regrettable impact ... and violated the applicable provision of the Code of Judicial Conduct." The Commission imposed no sanction, however, in view of the trial judge's "record of integrity and exemplary judicial service on behalf of the people of the District of Columbia over some twenty-one years."

Counsel's argument seems to be that a reasonable observer could conclude that in her rulings in this case the trial judge returned the "professional courtesy" to the police. The "objective observer" standard, however, implies the observer's knowledge of relevant facts—not speculation or simply cynicism—giving rise to "an appearance of bias or prejudice sufficient to permit the average citizen *reasonably* to question [the] judge's impartiality." *York v. United States*, 785 A.2d 651, 655 (D.C.2001) (emphasis added). Even assuming appellant's premise that the Commission's determination suggests that the trial judge was favorably disposed to the police, trial in this case preceded the incident underlying the Commission's determination by five years. But we reject the premise of bias altogether. The extensive record in this case reveals that the trial judge gave careful consideration to the evidentiary issues and struggled during extensive and intensive conversations with counsel in considering the motion for judgment as a matter of law. She was fully aware of the terrible events that had transpired and of the difficulty appellant faced in proving what happened when her son was shot. As we discuss in this opinion, her rulings were based on the law and the evidence, and it is for that reason that we affirm the judgment on appeal.