# UNITED STATES of America,

v.

# Eddie MATOS, Defendant.

## Criminal No. 05cr30012–NG.

United States District Court, D. Massachusetts.

Dec. 18, 2008.

---

Perman Glenn, III, Law Office of Perman Glenn, III, Springfield, MA, for Defendant.

Thomas E. Kanwit, United States Attorney's Office, Boston, MA, for Plaintiff.

*SENTENCING MEMORANDUM*

GERTNER, District Judge:

## TABLE OF CONTENTS

I. *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

II. *FACTS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125
 A. The Zayas Drug Conspiracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125
 B. The Firearms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

III. *PROCEDURAL HISTORY* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

IV. *STANDARD* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128
 A. Sentencing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128
 B. Safety Valve . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

V. *ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129
 A. Possession . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129
 1. Actual Possession . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130
 2. Constructive Possession . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131
 B. "In Connection With" The Offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

VI. *SENTENCE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .139
 A. **Nature and Circumstances of the Offense** . . . . . . . . . . . . . . . . . . . . . . . .139
 B. **Deterrence and Rehabilitation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .140
 C. **The Guidelines Sentencing Range** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .140

VII. *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .141

## I. INTRODUCTION

Eddie Matos ("Matos") was prosecuted for his role in a drug distribution conspiracy in Springfield, Massachusetts, led by Luis Zayas ("Zayas").[1] Matos assisted Zayas by permitting Zayas to store drugs and weapons at his house and by participating in several drug transactions. Prior to Matos' sentencing, Zayas—the conspiracy's leader and organizer—received a sentence of 10 years' imprisonment, consistent with a Guidelines recommendation of 120 to 135 months. Since the drug conspiracy involved more than 50 grams of a substance containing cocaine base (i.e., crack), Matos must also serve a mandatory minimum of at least 10 years unless he is found eligible for the "safety valve." *See* 21 U.S.C. § 841(b)(1)(A)(iii); 18 U.S.C. § 3553(f); U.S.S.G. § 5C1.1.

The government concedes that Matos satisfies four of the five safety valve criteria that would entitle him to a Guidelines sentence, rather than the 10–year mandatory minimum. Matos is a first-time offender, with no more than one criminal history point.[2] The offense did not result in death or serious bodily injury to any person. He was not an organizer, leader, manager, or supervisor in the conspiracy—indeed, far from it. And he has truthfully provided the government with all information and evidence in his possession relevant to the offense. *See* 18 U.S.C. § 3553(f)(1)-(5). In each of these respects, Matos fits the very profile that Congress contemplated when it enacted the safety valve statute in order to exempt certain first-time offenders from the extremely severe mandatory penalties applicable to drug trafficking offenses.[3] Thus, the sentencing determination turns on the last safety valve factor: whether Matos "possess[ed] a firearm ... in connection with the offense." 18 U.S.C. § 3553(f)(2).

As a possession case, this sentencing is unusual. Rather than relying solely on circumstantial inferences drawn from the guns' physical location and proximity to the drugs, the Court here has the benefit of direct evidence: Zayas admitted that he owned and possessed the weapons, a stipulation to which the government agreed at Zayas' trial.[4] Zayas Trial Tr. 203 (docu-

---

1. Matos was charged in a multi-count indictment together with codefendant, Luis Zayas. He was charged with aiding and abetting possession with intent to distribute both cocaine base and marijuana, 18 U.S.C. § 841(a) and 18 U.S.C. § 2, conspiracy to possess with intent to distribute and to distribute both cocaine base and marijuana, 21 U.S.C. § 846, and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c).

2. Matos' record shows only a single previous conviction for possession of marijuana some eight years ago, when he was nineteen. Matos Pre–Sentence Report ("PSR") ¶ 38.

3. *See* Pub. L. No. 102–322 (1994) (concluding that the "integrity and effectiveness of controlled substance mandatory minimums could in fact be strengthened if a limited 'safety valve' from operation of these penalties was created and made applicable to the least culpable offenders"); 139 Cong. Rec. S15314–01 (Statement of Senator Kennedy) (the safety valve would "permit a small number of low-level, non-violent defendants who would otherwise be subject to mandatory minimum laws to be sentenced under the guideline system instead").

4. The Zayas trial transcript was incorporated into the record at Matos' sentencing.

ment # 180); *see also* Matos PSR ¶ 18. Zayas had a key to Matos' house and was permitted to store both drugs and guns there. Statement of Eddie Matos, March 3, 2005 (document # 209–2). Even the confidential witness ("CW") testified to having seen Zayas, but not Matos, regularly carry the .25 caliber handgun with him on drug deals. Zayas Trial Tr. 104–06 (document # 178). Finally, Matos' fingerprints were not found on any of the guns.[5]

Just as significantly, a jury *acquitted* Zayas of possessing the firearms found in Matos' house in furtherance of the drug offense. But while the government dropped the gun charge against Matos after Zayas' acquittal, it continues to press the argument that Zayas' guns disqualify Matos from the safety valve. In short, it argues that Matos should receive a sentence equal to his boss—even though Zayas, who purchased and carried the weapons, was acquitted of possessing the guns in furtherance of the offense.

Based on the Court's weighing of the evidence, it finds that Matos did not possess a firearm in connection with the offense. In particular, Matos has satisfied his burden of showing, by a preponderance of the evidence, that he did not have the "intention to exercise control, or dominion and control" over the firearms that Zayas stored at his house. *United States v. Smith*, 292 F.3d 90, 99 (1st Cir.2002) (citing *United States v. Zavala Maldonado*, 23 F.3d 4, 7 (1st Cir.1994)); *see also United States v. DeCologero*, 530 F.3d 36, 67 (1st Cir.2008) (constructive possession requires that the defendant "knowingly

ha[ve] the *power* and the *intention* at a given time of exercising dominion and control over a firearm"). Moreover, even if Matos had constructive possession of the weapons, the Court does not believe that such possession was "in connection with the offense" within the meaning of § 3553(f)(2).

The possession determination, of course, does not end the sentencing inquiry. As it is, even with the safety valve, Matos stands to receive a recommended Guidelines sentence of 57 to 71 months' imprisonment. The safety valve is no free ticket. For the reasons stated below, the Court sentences Matos to 57 months in prison, finding that this penalty satisfies the purposes of punishment set forth in 18 U.S.C. § 3553(a).

## II. *FACTS*

### A. The Zayas Drug Conspiracy

Luis Zayas led and operated a cocaine and marijuana distribution ring from his house at 37 Allendale Street in Springfield, Massachusetts. Eddie Matos lived across the street, at 38 Allendale Street. It is uncontested that Matos permitted Zayas to use his residence as one of several "safe houses," where Zayas stored and packaged significant quantities of drugs.[6] Zayas had at least two other safe houses in Springfield, and one in Holyoke, Massachusetts, from which he distributed cocaine. Zayas Trial Tr. 59, 97, 100 (document # 178). The government arranged three controlled purchases of crack cocaine from Zayas by a confidential witness ("CW") over a peri-

---

**5.** Both sides had notice of the fingerprint evidence at sentencing, although the government did not seek its admission at Zayas' trial. Matos, however, requested that the fingerprint analysis be made part of the sentencing record. The Court agreed over the government's objection. Under 18 U.S.C. § 3661, "No limitation shall be placed on the information concerning the background, character,

and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

**6.** Matos' girlfriend and Zayas' wife are cousins, and the two had been neighbors for approximately seven years. Statement of Eddie Matos, Mar. 3, 2005 (document # 209–2).

od of four months. On each occasion, the CW called Zayas with a request to buy crack and Zayas instructed the witness to drive to his address at 37 Allendale Street to purchase the drugs. Zayas or a third individual called "Chino" would then meet the CW there and they would conclude the transaction, either at Zayas' house or across the street. Matos PSR ¶¶ 12–14.

Matos directly participated in only one of these drug sales. The first purchase, on November 16, 2004, was conducted by Chino at Zayas' residence; there is no evidence that it involved Matos or that the purchased drugs had even been stored at his house. Matos PSR ¶ 12. On a second occasion two weeks later, after Chino met the CW and escorted him from Zayas' house across the street to Matos' driveway, Matos handed Chino a pill bottle of crack, which was then sold to the CW. On the last occasion, on February 24, 2005, Zayas brought the CW to the safe-house, Matos' residence, after they had already completed the crack cocaine purchase, where the CW reported seeing Matos packaging and selling marijuana. Matos PSR ¶¶ 12–14. Finally, Matos admits that the night before their arrest, he and Zayas drove to New York in Zayas' pick-up truck to purchase cocaine, which was then cooked into crack at Matos' house.

Based on these facts, there is no question that Matos was several levels below Zayas in the drug conspiracy's hierarchy. At the same time, there is little doubt that Matos agreed to keep the drugs at his house and, on at least one occasion, participated in preparing the drugs for sale; he also admitted to selling small amounts of marijuana himself. But no evidence suggests that he dealt directly with Zayas' crack customers or his suppliers or that

Matos oversaw or directed any other members of the conspiracy. Nor is there any evidence that Matos carried a weapon during any drug transaction.

**B. The Firearms**

In addition to drugs, Matos allowed Zayas to store three firearms at the house: a .25 caliber handgun, a .45 caliber handgun, and a semiautomatic AR–15 assault rifle, together with ammunition. When police arrested Zayas and Matos on March 3, 2005, they discovered the .45 caliber handgun and the AR–15 assault rifle hidden together in the ceiling of Matos' basement. The .25 caliber handgun was found on top of a kitchen cabinet, alongside several small bags of marijuana, a metal pan laced with cocaine residue, a shotgun shell, a scale, and two pay stubs with Matos' name on them. Matos PSR at ¶ 15. It is the .25 caliber handgun that is the focus of the government's arguments at sentencing. *See* Gov't Second Sent. Mem. 4–6 (document # 209).

At his arrest, Zayas expressly admitted to owning all three of the weapons and to storing them under Matos' roof with his drugs. Matos PSR ¶ 18. He had a spare key to Matos' house and could come and go as he pleased. *See* Statement of Eddie Matos, Mar. 3, 2005 (document # 209–2). Zayas reiterated the fact that he owned and possessed these guns, and had stored them at Matos' house, when he pleaded guilty to Count 8 of the Indictment—a statement which the government accepted and read into the record at Zayas' trial.[7] *See* Zayas Trial Tr. 203. In addition, the CW testified before the jury that Zayas carried the .25 caliber pistol with him during drug deals for protection, and that on

---

7. Zayas pleaded guilty to the drug offenses charged in the indictment, as well as possession of a firearm by a convicted felon under 18 U.S.C. § 922(g) (Count 8). He contested

his guilt, however, on possession of a firearm in furtherance of a drug trafficking offense (Count 7). *See* 18 U.S.C. § 924(c). A jury acquitted Zayas on this count at trial.

various occasions he had seen Zayas taking this gun in and out of the backpack in which he carried drugs. Zayas Trial Tr. 104–06. Special Agent Martin testified to Zayas' statement that he carried the guns for protection, based on a previous dispute he had with a rival gang member. *Id.* at 74.

By contrast, no testimony suggested that Matos had ever carried or used any of the weapons stored at his house. Matos has admitted that he allowed Zayas to store the guns at 38 Allendale Street and that he knew where they were kept. He states, however, that on at least one occasion he asked Zayas to remove the weapons, though this never occurred. *See* Statement of Eddie Matos, Jan. 4, 2006 (document # 209–3); Statement of Eddie Matos, Mar. 3, 2005 (document # 209–2). Importantly, only Zayas' fingerprints were found on the gun above the kitchen cabinet, although Matos admitted that he had handled or moved it at some point.[8] *Id.* According to Matos, the gun was kept out of sight with other contraband, including some marijuana belonging to him, in a place where Zayas could reach the weapon as he came and went from the safe house. *See* Def. Supp. Sent. Mem. 3 (document # 208). Matos was not involved in procuring any of the weapons and had no knowledge of their source or origin. Statement of Eddie Matos, Mar. 3, 2005 (document # 209–2).

---

**8.** The Court does not view Matos' statement, several hours after his arrest, that he had "handled and possessed in [his] hand" the .25 caliber pistol as establishing legal possession for the purposes of the safety valve. Statement of Eddie Matos, Mar. 3, 2005 (document # 209–2). It is plain from the context that Matos was conceding that he had held the weapon at some point, not that he had "possessed" the weapon "in connection with" the offense. Simply touching an item, by itself, does not constitute legal possession. *See*

## III. *PROCEDURAL HISTORY*

Zayas and Matos were arrested on March 3, 2005. Both pleaded guilty to multiple counts of possession with intent to distribute and conspiracy, while standing on their right to a jury trial on Count 7, possession of a firearm in furtherance of a drug trafficking crime under 18 U.S.C. § 924(c). Zayas was tried first, at a proceeding in which he and the government stipulated that he had owned and possessed the firearms stored at Matos' house. *See* Zayas Trial Tr. 203, 206 (document # 180). Accordingly, the jury heard two days of testimony on the sole issue of whether Zayas' possession of the guns had been "in furtherance of" the drug transactions, as required by the statute. Despite the testimony described above, the jury rejected the government's case; it acquitted Zayas, the conspiracy's ringleader and organizer, of having possessed a firearm in furtherance of a drug trafficking crime. Zayas was later sentenced to 10 years' imprisonment, based on his guilty plea to the drug charges and his leadership role in the drug conspiracy.

Shortly after the jury acquitted Zayas on Count 7, the government chose to dismiss the same gun possession charge against Matos. Yet having done so, it now seeks to revive the possession issue at sentencing, insisting that Matos is ineligible for the safety valve, and must also serve a mandatory minimum of at least 10 years, because he possessed a firearm "in connection with" the offense. *Compare* 18 U.S.C. § 3553(f), *with* 18 U.S.C. § 924(c).[9]

---

*United States v. Vasquez–Chan,* 978 F.2d 546, 551–52 (9th Cir.1992) ("The presence of [the defendant's] fingerprints on the [drug] containers by no means establishes that she exercised 'dominion and control' over the contents, nor would the fact that she touched or moved the lid of an opened canister."). Whether Matos possessed the firearm, within the meaning of 18 U.S.C. § 3553(f), is the question now before the Court.

**9.** Section 924(c) requires that possession be "in furtherance of" the drug trafficking of-

## IV. STANDARD

### A. Sentencing

■ A district court's task at sentencing is guided by 18 U.S.C. § 3553(a) and the Supreme Court's recent decisions in *Booker, Gall,* and *Rita,* which control application of the United States Sentencing Guidelines. *See Rita v. United States,* 551 U.S. 338, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007); *Gall v. United States,* — U.S. ——, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007); *United States v. Martin,* 520 F.3d 87, 91 (1st Cir.2008); *see also United States v. Carty,* 520 F.3d 984, 991–94 (9th Cir.2008) (reviewing step-by-step sentencing procedure in light of recent Supreme Court decisions). Procedurally, a district court is required to calculate the appropriate Guidelines range and to take that measure as its "starting point and the initial benchmark" in the sentencing analysis. *Kimbrough v. United States,* — U.S. ——, 128 S.Ct. 558, 574, 169 L.Ed.2d 481 (2007) (quoting *Gall,* 128 S.Ct. at 586). The court must also consider any nonfrivolous arguments for a departure or variance raised by the parties, and must provide a statement of reasons for the sentence it imposes. *Rita,* 127 S.Ct. at 2468. Ultimately, however, the sentencing judge must select a sentence within the statutory range which is "sufficient, but not greater than necessary" to satisfy the varied purposes of punishment identified by Congress. 18 U.S.C. § 3553(a)(1); *see also* 18 U.S.C. § 3553(a)(2).

Where applicable, however, the mandatory minimums provided by statute trump the Guidelines recommendation and any additional mitigating factors—except where a defendant meets all of the safety-valve criteria. Because the drug distribution conspiracy involved more than 50 grams of a substance containing cocaine base, Matos must serve a mandatory minimum sentence of at least 10 years unless he is found eligible for the safety valve. *See* 21 U.S.C. § 841(b)(1)(A)(iii).

### B. Safety Valve

■ Under First Circuit law, a defendant bears the burden of proving, by a preponderance of the evidence, that he is entitled to the safety valve offered by § 3553(f). *See e.g., United States v. Stark,* 499 F.3d 72, 80 (1st Cir.2007); *United States v. Miranda–Santiago,* 96 F.3d 517 (1st Cir.1996). As noted above, it is undisputed that Matos satisfies four of the five safety valve factors; only the gun possession issue is contested. Accordingly, to be eligible for a Guidelines-recommended sentence, Matos must show by a preponderance of the evidence that he "did not . . . possess a firearm or other dangerous weapon (or induce another person to do so) in connection with the offense."

---

fense, a slightly stricter requirement than § 3553(f)(2)'s "in connection with" standard. The difference is the nexus or relationship that must be shown between the gun and the underlying crime. In creating the present version of § 924(c), Congress noted that the "in furtherance of" language required a slightly greater degree of connectivity between the gun and the crime than did the previously-existing "during and in relation to" language. *See* 144 Cong. Rec. S12670, S12670 (daily ed. Oct. 16, 1998) (statement of Sen. DeWine). Much the same, "in furtherance of" also suggests a somewhat higher standard than "in connection with," since the latter does not imply active promotion of the underlying crime. Despite this textual distinction, the First Circuit has often treated two standards all but identically. *Compare United States v. Garner,* 338 F.3d 78, 81 (1st Cir.2003) and *United States v. Felton,* 417 F.3d 97, 106 (1st Cir.2005), *with United States v. McLean,* 409 F.3d 492, 504 (1st Cir.2005) (safety-valve decision relying on the First Circuit's § 924(c) analysis in *United States v. Nieves–Burgos,* 62 F.3d 431, 437–38 (1st Cir. 1995)).

§ 3553(f)(2); *see United States v. Morrisette,* 429 F.3d 318, 324–25 (1st Cir.2005).

## V. *ANALYSIS*

The parties' arguments at sentencing primarily revolve around the .25 caliber handgun, both because of its accessible location and its proximity to the marijuana, which Matos has said was his, and to Matos' pay stubs. *See* Gov't Supp. Sent. Mem. 3–6 (document # 209). The government has not argued that the mere presence of the two weapons hidden in Matos' basement ceiling establishes possession.

Compared to the wide majority of possession controversies this Court has heard, this case is unusual. *See, e.g., United States v. Pena,* No. 05–CR–10332–NG. The Court has direct evidence of the guns' origin, ownership, and purpose; it need not rely on circumstantial inferences to establish possession or the relationship between the guns and the drugs. Luis Zayas has admitted that he owned and possessed the weapons. Zayas Trial Tr. 203 (document # 180); *see also* Matos PSR ¶ 18. The very crux of the charged conspiracy was Zayas' use of Matos' home to prepare and package drugs. Zayas had a key to the house and was permitted to store both drugs and guns there. Statement of Eddie Matos, Mar. 3, 2005 (document # 209–2). And the CW testified to having seen Zayas, but not Matos, regularly carry the .25 caliber handgun with him on drug deals. Zayas Trial Tr. 104–06. Fingerprints linked only Zayas, not Matos, to the gun in question.

By virtue of these facts and admissions, the Court does not face the more common possession dispute—whether the defendant possessed the guns or "no one" did—but a much closer question: whether Zayas possessed the guns alone, or there was joint possession. *See, e.g., United States v. Weems,* 322 F.3d 18, 25 (1st Cir.2003) (observing, over the defendant's objec-

tions, that "the gun came from somewhere"). Unlike many defendants arrested with guns close at hand, Matos has raised a credible alternative account of how the firearms entered his house—and to whom they belonged. The availability of this alternative, backed by direct evidence, immensely alters the overall inferential calculus.

Finally, even if Matos were deemed to have possessed the weapons, the Court must address whether any possession was "in connection with" the offense. 18 U.S.C. § 3553(f)(2). As described below, it concludes that, even in this event, the evidence does not show the necessary nexus between the guns and Matos' role in the conspiracy. In short, Matos has demonstrated that neither component of § 3553(f)(2) properly applies to him—he neither possessed the firearms nor, as a further matter, did he propose to use them in connection with his role in the Zayas drug conspiracy.

### A. Possession

As the First Circuit has recognized, possession may be either sole or joint. *See United States v. Van Horn,* 277 F.3d 48, 55 (1st Cir.2002) (possession of a weapon may be "either actual or constructive, sole or joint") (quoting *United States v. Vargas,* 945 F.2d 426, 428 (1st Cir. 1991)); *United States v. Zavala Maldonado,* 23 F.3d 4, 6 (1st Cir.1994) ("possession" includes "joint as well as exclusive possession"). The law is also clear, however, that the safety valve does not contemplate conspiratorial liability. Thus, while the Court must determine whether Matos had joint possession with Zayas, he cannot be denied the safety valve *on account of* Zayas' admitted possession. The very purpose of the safety valve was to restore individual culpability for first time, nonviolent offenders who had been caught up

in a far larger criminal enterprise. *See* 139 Cong. Rec. S15314–01 (1993). Accordingly, the safety valve's requirements are personal—possession under § 3553(f)(2) may not be imputed to co-conspirators. *See United States v. Figueroa–Encarnacion*, 343 F.3d 23, 35 (1st Cir.2003) (holding that "any automatic equation of the possession of a firearm by another and unavailability of the safety valve [for a co-conspirator] is mistaken").[10] Whether Matos possessed the weapons is a question that turns entirely on his individual power and intent to use or employ the guns in connection with his role in the drug trafficking offense.

### 1. Actual Possession

■ In order to resolve Matos' safety valve eligibility, the Court must determine whether Matos had actual or constructive possession of the firearms—either will suffice to render a defendant ineligible under the statute. *See United States v. McLean*, 409 F.3d 492, 500–01 (1st Cir.2005). Actual possession is generally defined as "the state of immediate, hands-on physical possession." *See United States v. Zavala Maldonado*, 23 F.3d 4, 6 (1st Cir.1994). "A person who has direct physical control of something on or around his or her person is then in actual possession of it." First Circuit Pattern Criminal Jury Instructions, 4.18.922(g) & 4.18.922(k) (2008); *see United States v. Holt*, 464 F.3d 101, 103, 106 (1st Cir.2006) (approving pattern

jury instruction); *United States v. Teemer*, 394 F.3d 59, 62 (1st Cir.2005) (same).

■ The Court finds that Matos did not have actual possession of the weapons. Matos was not arrested carrying any of the weapons or ever seen carrying a gun; nor does the mere fact that he admitted moving or handling the weapon at some point constitute actual possession within the meaning of the statute. Matos' fingerprints were not found on any of the firearms—only Zayas' fingerprints were discovered there, consistent with the CW's account at trial. Moreover, as common sense suggests and a number of courts have expressly stated, simply touching an item does not automatically imply legal possession. *See United States v. Wilson*, 922 F.2d 1336, 1339 (7th Cir.1991) (observing that "merely touching [a gun] would not be possessing it"); *United States v. Vasquez–Chan*, 978 F.2d 546, 551–52 (9th Cir.1992) ("The presence of [the defendant's] fingerprints on the [drug] containers by no means establishes that she exercised 'dominion and control' over the contents, nor would the fact that she touched or moved the lid of an opened canister."); *United States v. Beverly*, 750 F.2d 34, 35–37 (6th Cir.1984) ("The evidence clearly demonstrated that he must have 'touched' the gun at some point. . . . The government, however, has failed to prove constructive possession."); *United States v. De Leon*, 170 F.3d 494, 499 (5th Cir.1999) (district court judge correctly in-

---

10. This view is consistent with the wide majority of circuits. *See, e.g., United States v. Pena–Sarabia*, 297 F.3d 983, 989 (10th Cir. 2002) (holding "a joint criminal actor's firearm possession is not attributable to a defendant for purposes of applying the mandatory minimum safety valve provision"); *United States v. Clavijo*, 165 F.3d 1341, 1343–44 (11th Cir.1999) (finding defendant was "entitled to safety-valve relief even though his co-defendant possessed a firearm"); *United States v. Wilson*, 114 F.3d 429, 432 (4th Cir.

1997) (refusing to attribute co-conspirator's possession of a firearm to the defendant for the purpose of the safety valve); *United States v. Wilson*, 105 F.3d 219, 222 (5th Cir.1997) (agreeing that safety valve relief was not precluded unless defendant himself "actually possessed a firearm during the conspiracy"); *In re Sealed Case*, 105 F.3d 1460, 1462 (D.C.Cir.1997) (holding that "co-conspirator liability cannot establish possession under the Guideline's safety valve").

structed jurors that they could not conclude that the defendant had "possessed" the contraband if they found that he had "simply touched the ammunition on one occasion").

In any case, if Matos simply moved the .25 caliber pistol above the kitchen cabinet, and nothing more, that action would not amount to possessing a weapon *in connection with* the offense. *Cf. Wilson,* 922 F.2d at 1338–39 (noting that "[t]here were explanations available, fully consistent with innocence, which would have explained the [finger]print. Perhaps Wilson brushed his hand against the gun one day while making the bed.... Perhaps he momentarily grabbed the gun from the children, after finding them playing with it. The possibilities are endless."). Because no evidence suggests that Matos was in immediate, hands-on possession of any weapon, the Court holds that he did not have actual possession.

### 2. Constructive Possession

■ The more difficult question is whether Matos constructively possessed the weapons. Constructive possession is established when a person "knowingly has the power and intention at a given time to exercise dominion and control over an object, either directly or through others." *United States v. Ocampo–Guarin,* 968 F.2d 1406, 1409–10 (1st Cir.1992) (citing *United States v. Lamare,* 711 F.2d .3, .5 (1st Cir.1983)). This formulation has been routinely applied by the First Circuit. *See, e.g., United States v. Mangual–Garcia,* 505 F.3d 1, 11 (1st Cir.2007) (requiring

power and intent to exercise control over an object); *United States v. Smith,* 292 F.3d 90, 99 (1st Cir.2002) (" 'Constructive' possession is commonly defined as the power and intention to exercise control, or dominion and control, over an object not in one's 'actual' possession.") (citing *United States v. Zavala Maldonado,* 23 F.3d 4, 7 (1st Cir.1994)); *United States v. Del Rosario,* 388 F.3d 1, 8 (1st Cir.2004), *vacated on other grounds sub nom., Pacheco v. United States,* 544 U.S. 970, 125 S.Ct. 1866, 161 L.Ed.2d 716 (2005) ("Constructive possession exists when a person knowingly has the power and intention at a given time to exercise dominion and control over an object, either directly or through others."); *United States v. Sanchez–Badillo,* 540 F.3d 24, 31 (1st Cir. 2008); *United States v. DeCologero,* 530 F.3d 36, 67 (1st Cir.2008) (constructive possession is proven by demonstrating that the defendant "knowingly had the *power* and *intention* at a given time of exercising dominion and control over a firearm ..., directly or through others."). The same standard, requiring both the power and the intent to control the contraband item, is employed in the majority of circuits.[11]

■ Based on this accepted standard for possession, the Court finds that Matos did not constructively possess Zayas' guns. In particular, the weight of the evidence does not demonstrate that Matos intended to "exercise dominion and control" over the weapons in connection with the drug

---

11. *See United States v. Paulino,* 445 F.3d 211, 222 (2d Cir.2006) (stating that defendant's constructive possession over drugs found in his closet turned on his "knowledge" that "he had the physical power to place things in and remove them from the closet" and "his intent to exercise it with respect to the contraband"); *United States v. Jones,* 531 F.3d 163, 169 (2d Cir.2008); *United States v. Teague,* 93 F.3d 81, 84 (2d Cir.1996); *United States v.*

*Iglesias,* 535 F.3d 150, 156 (3d Cir.2008); *United States v. Garth,* 188 F.3d 99, 112 (3d Cir.1999); *United States v. Brown,* 3 F.3d 673, 680 (3d Cir.1993); *United States v. Kincaide,* 145 F.3d 771, 782 (6th Cir.1998); *United States v. Moses,* 513 F.3d 727, 733 (7th Cir. 2008); *United States v. Campbell,* 534 F.3d 599, 605–06 (7th Cir.2008); *United States v. Greer,* 440 F.3d 1267, 1271 (11th Cir.2006).

trafficking. After hearing the live testimony given at Luis Zayas' trial, as well as the evidence presented at sentencing, the Court credits Matos' argument that he did not use, carry, or otherwise intend to control Zayas' guns.

The government's evidence is circumstantial, based on the guns' presence in Matos' house and the .25 caliber pistol's proximity to the marijuana Matos has admitted was his. Whatever inferences the government urges from these facts are outweighed by the direct evidence, which the Court finds to be credible. Zayas' admission, the cooperating witness' observations, the absence of Matos' fingerprints on the guns or other direct proof, and the clear division of labor within the drug conspiracy present a coherent, credible basis for finding that Matos did not possess the weapons. Zayas obtained the weapons and stored them at Matos' house at his own initiative.[12] Zayas came and went from Matos' house as he pleased; and it was Zayas, not Matos, who regularly carried a gun with him on drug deals, stating that he needed protection based on a longstanding dispute with a rival gang member. *See* Zayas Trial Tr. 74. None of the testimony suggests that Matos had an interest in the weapons. Based on these facts, the Court cannot make the inferential leap urged by the government.

The safety valve's possession requirement is clear: it requires an intent to control the guns and to possess them in connection with the offense—that is, it requires something more than mere knowledge or access. Here, neither Matos' knowledge of the guns nor the fact that they were found in his home automatically prove possession. *United States v. Duval*, 496 F.3d 64, 77 (1st Cir.2007) ("[K]nowledge of an object's location, without more, is insufficient to establish possession of that object."); *United States v. Vasquez–Chan*, 978 F.2d 546 (9th Cir.1992) (reversing drug possession conviction even where defendants knew that large amounts of cocaine were kept in the rooms they had stayed in for months); *United States v. Zeigler*, 994 F.2d 845 (D.C.Cir.1993) (finding that even if the defendant knew of cocaine in the apartment where she lived, she did not possess it). Rather, in the absence of direct proof, the Court must decide whether the evidence supports the additional inference that Matos meant to use the guns himself. Put simply, in this case it does not.

To be sure, the First Circuit has previously sustained inferences similar to those now urged by the government, which argues that the pistol's discovery atop Matos' cabinet and alongside his things requires the Court to find that the gun was his. *See, e.g., United States v. Wight*, 968 F.2d 1393, 1397 (1st Cir.1992) (defendant's control over van in which weapon was found permitted jury's inference of possession); *United States v. Barnes*, 890 F.2d 545, 549–51 (1st Cir.1989) (defendant's dominion and control over apartment in which drugs were found permitted jury's inference of possession); *United States v. Lochan*, 674 F.2d 960, 965–66 (1st Cir.1982) (driver's control over vehicle in which drugs were found permitted jury's inference of possession). *But see United States v. Brown*, 3 F.3d 673, 683 (3d Cir.1993) (neither defendant's control over the house nor her knowledge of the presence of drugs on the premises was enough to support an inference that she had dominion and control over the drugs found therein).

But the government misconstrues the significance of these cases. They suggest

---

12. The Court notes that Zayas also stored weapons at his mother's house. *See* Zayas Trial Tr. 73–74.

that a defendant's control over the area where contraband is found *may* support a jury's conclusion that the defendant possessed the contraband. But they hardly establish a per se rule, and they surely do not end the possession inquiry. *See United States v. McLean*, 409 F.3d 492, 502 (1st Cir.2005) (finding a defendant eligible for the safety valve despite his ownership of the trailer where firearm was found and his participation in the drug trafficking conspiracy).

■ Nearly all of the constructive possession cases on which the government would rely have one fact in common: they are appeals by defendants who challenge the sufficiency of the evidence supporting their convictions. The standard of review in these cases is crucially different from the instant case. *See Wight*, 968 F.2d at 1395; *Barnes*, 890 F.2d at 549; *United States v. Vargas*, 945 F.2d 426, 427–28 (1st Cir.1991); *United States v. Ocampo–Guarin*, 968 F.2d 1406, 1409 (1st Cir.1992); *United States v. Sanchez–Badillo*, 540 F.3d 24, 32 (1st Cir.2008); *United States v. Van Horn*, 277 F.3d 48, 54–55 (1st Cir. 2002); *United States v. DeCologero*, 530 F.3d 36, 65 (1st Cir.2008).[13] A reviewing court considering the sufficiency of the evidence is obliged to apply perhaps the most generous standard available to the government's proof and the jury's findings. In each of these cases, the appellate court was required to decide whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Barnes*, 890 F.2d at 549 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)) (internal quotation marks omitted); *see also Wight* at 1395; *Ocampo–Guarin*, 968 F.2d at 1409. And, appropriately, in nearly all such cases the reviewing court has chosen to credit the jury's verdict; it has declined to overturn the jury's possession finding where the proof supplied a plausible basis for that conclusion.

But the lesson drawn from these appeals for sufficiency of the evidence must not be mistaken: these cases do not create a per se rule, nor even a rebuttable presumption of possession. Given the standard applied on appeal, at most they recognize a *permissible inference* drawn by the fact-finder based on the evidence presented to the court.[14] They recognize that a rational jury *could* reasonably infer possession, but they do not require or compel that conclusion where the facts, as here, show otherwise.

In a sentencing proceeding, like the case at bar, the parties labor under a very different standard, with the sentencing judge sitting as fact-finder. *See United States v. Robinson*, 460 F.3d 550, 559 (4th Cir.2006) (noting that whether a defendant possessed a firearm is a factual issue at sentencing); *United States v. Dorsey*, 59

---

13. *United States v. McLean*, 409 F.3d 492 (1st Cir.2005), which is described below, involved an application of the safety valve at sentencing; and, indeed, in this case the court of appeals found that constructive possession had not been established as to both McLean and another defendant, despite the fact that McLean owned and lived in the trailer where the gun was seized and the drugs stored. *Id.* at 502–03.

14. Indeed, these cases are replete with conditional language. *See, e.g., United States v. Vargas*, 945 F.2d 426, 428 (1st Cir.1991) ("An accused's dominion and control over the area where the contraband [is located], *may* be enough to demonstrate constructive possession of the contraband located there.") (emphasis added) (internal citations omitted); *Wight*, 968 F.2d at 1396 ("[I]t was *reasonable* for a rational trier of fact to infer that appellant knew the weapon's location, had ready access to it, and possessed it in the van to facilitate the drug deal.") (emphasis added).

Fed.Appx. 284, 285 (10th Cir.2003) (same). The Court is not obliged to view the evidence in the light most favorable to the prosecution, nor must it defer to the conclusions of a previous fact-finder.[15] It views the evidence and evaluates its credibility for the first time. As noted above, the defendant here bears the burden of proving, by a preponderance of the evidence, that he is entitled to a diminution of his sentence pursuant to § 3553(f). *See e.g.*, *United States v. Stark*, 499 F.3d 72, 80 (1st Cir.2007); *United States v. Miranda–Santiago*, 96 F.3d 517, 529 n. 25 (1st Cir. 1996).

Under these circumstances, the Court finds that the inference urged by the government is not warranted: the facts belie the government's circumstantial case that Matos "possessed" the firearms in connection with the offense simply because he permitted Zayas to store them in his house and participated in drug sales. In *United States v. McLean*, as here, the court considered an application of the safety valve that turned on the defendants' joint possession of a firearm. 409 F.3d 492, 499–504 (1st Cir.2005). On appeal, the First Circuit refused to find that two low-level drug conspiracy defendants, McLean and Berguette, had possessed a gun found in the trailer where both were living; in par-

ticular, it rejected the government's argument that McLean possessed the gun simply because he owned the trailer, lived in the trailer, and had been an active participant in the drug conspiracy. *Id.* at 502–03. Importantly, although the First Circuit doubted whether McLean had knowledge of the gun, despite testimony that he had, it declared that even this knowledge would not have been enough to establish constructive possession.[16] *Id.* at 503 nn. 11, 12. Ultimately, the court found that both McLean and his co-defendant Berguette were eligible for the safety valve.

As to a third defendant, Feliz, the court of appeals sustained the sentencing judge's possession finding, based on the lower court's determination that Feliz *intended* to use and control the weapon. *See id.* at 504. Its decision was not based simply on Feliz's admitted knowledge of the gun, nor the weapon's proximity to the drugs that all the defendants sold; rather, the First Circuit twice pointed to Feliz's "role in the conspiracy" to support its inference of intent. *See id.*; Gov't Br. at 10–11, 21, 32, *United States v. Feliz–Terrero*, No. 03–2600 (1st Cir.2004) (explaining that Feliz supervised the other participants and arguing for a leadership enhancement based on his "role in managing the conspiracy's assets"). Unlike Matos, Feliz was recruit-

---

**15.** In fact, the Court in this case is aided by a previous jury determination: at his trial, a jury acquitted Luis Zayas of possession of a firearm in furtherance of a drug trafficking crime under 18 U.S.C. § 924(c)(1)(A), finding that he had not possessed the guns "in furtherance of" the drug conspiracy. As described above, after the jury's acquittal of Zayas—the conspiracy's ringleader and organizer—on this charge, the government promptly dropped the same possession charge against Matos. Yet having done so, the government now insists that this Court make a nearly identical finding at Matos' sentencing to preclude his eligibility for the safety valve. *Compare* 18 U.S.C. § 924(c), *with* 18 U.S.C. § 3553(f)(2).

**16.** The court of appeals found that even if McLean's knowledge were shown, power to control the weapon was lacking. *See McLean*, 409 F.3d at 503 n. 12. In Matos' case, it is not access to the weapon, but intent to use or control it that the Court finds unsupported. Both power and intent are necessary to prove constructive possession under the prevailing standard. *See United States v. De-Cologero*, 530 F.3d 36, 67 (1st Cir.2008) (constructive possession is proven by demonstrating that the defendant "knowingly had the *power* and *intention* at a given time of exercising dominion and control over a firearm ..., directly or through others") (quoting *Wight*, 968 F.2d at 1398) (internal quotation marks omitted).

ed "to oversee the drug operations at the trailer", he was a high-level member of a conspiracy that used "threats of force and violence", and he had been present when a co-conspirator traded crack cocaine for the gun later found in his bedroom. Gov't Br. at 10, 28, *Feliz–Terrero*, No. 03–2600 (1st Cir.2004). In short, on account of his supervisory role in a conspiracy that threatened violence, it was implausible to believe that Feliz had no part in procuring the weapon and no intention of using the gun as needed.

Matos simply does not fit this bill, and any comparison to Feliz based on the full facts of these two cases is inapt. Matos was not a leader or supervisor within the conspiracy, he had no role in obtaining the weapons, there is not a hint in the record that he discussed or contemplated violence, and no evidence suggests that he was inclined to use any of the guns in connection with the drug trafficking. Indeed, Matos more closely resembles the low-level defendants, McLean and Berguette, who simply packaged and sold drugs at the direction of those leading the conspiracy. Here, *McLean* demonstrates most of all that possession in conspiracy cases may often be an extremely fact-intensive question. Applying a more even-handed standard of review—by contrast to sufficiency of the evidence appeals—the *McLean* court found that two of the three co-conspirators did not meet the requirements for constructive possession, despite the discovery of a gun close at hand. Based on the evidence here, the Court finds that Matos, too, is eligible for the safety valve.

Even courts "viewing the evidence in the light most favorable to the prosecution" have found occasion to reject the conclusion that a defendant like Matos constructively possessed the contraband. In *United States v. Brown*, 3 F.3d 673 (3d Cir. 1993), the Third Circuit found the evidence insufficient to establish that defendant Bal-timore constructively possessed more than a kilogram of cocaine discovered in the house where she lived. Like the "safe house" operated out of Matos' residence, the defendant in *Brown* lived in a "cut house"—"a house where large quantities of drugs were stored, cut, and packaged for sale." *Id.* at 681. While the court found that Baltimore likely had knowledge of the drugs on the premises, it held that she had not possessed them and thus reversed her conviction. *See id.* at 681–84. In support, the Third Circuit remarked that the defendant's fingerprints were not found on any of the drugs or drug paraphernalia, nor was she otherwise directly linked to the drugs themselves. "[T]o the extent that these facts support findings that [Baltimore] resided at and had some control *over the house* and that she knew of the drugs' presence in the house," they "do not support an inference that she had dominion and control over the drugs found therein." *Id.* at 683. In this case, Matos admits his involvement in the drug trafficking but as in *Brown*, his connection to the drugs and the "safe house" does not, by necessity, prove that Matos also exercised dominion and control over the guns brought in by Zayas.

The facts and findings of *United States v. Vasquez–Chan*, 978 F.2d 546 (9th Cir. 1992), another "stash house" case, again resonate here. There, two defendants sought to reverse their drug conspiracy convictions after they were arrested living in a house where police discovered approximately 600 kilograms of cocaine. Despite the fact that Vasquez–Chan "knew that a large quantity of cocaine was present, she had lived in the house for three months, she was employed as a caretaker for the house," and that her co-defendant Gaxiola "slept in the back bedroom where the containers were kept, and her fingerprints were found on six of the [drug] containers, including one inside of a cover," the court

found the evidence insufficient to establish their possession of the drugs. *Id.* at 550. Neither knowledge of the drugs nor physical contact with the canisters was enough where the full record showed that the defendants, a housekeeper and houseguest, had not exercised dominion or control over the narcotics despite living and working in their midst. A person "does not possess drugs owned by others merely because she is fully aware of their existence and location." *Id.* at 551. Indeed, among the factors that the Ninth Circuit identified in reaching its decision was the "overwhelming evidence that the narcotics belonged to others." *Id.*

While Matos packaged and sold drugs in this case, it is undisputed that Zayas obtained the guns, brought them into the house, and carried them with him on drug deals. No evidence links Matos to the firearms in remotely the same way. Despite Matos' knowledge of the guns and the fact that he, like Gaxiola, may have touched or moved the contraband at some point, these facts in context do not prove possession.

A third case, *United States v. Zeigler,* 994 F.2d 845 (D.C.Cir.1993), also supports this recognition that Matos' knowledge of the guns in his home may still fall short of possession. Zeigler appealed her conviction for possession of cocaine after she was arrested in her boyfriend's apartment amidst a trove of weapons and drugs. She admitted that a bag of marijuana found in the bedroom that she and her boyfriend shared was hers; the cocaine, however, was discovered in a laundry room down the hall and she challenged the sufficiency of the evidence showing that she had possessed those drugs. Despite "[v]iewing the government's evidence in the light most favorable to it," the D.C. Circuit found that no rational trier of fact could have concluded that Zeigler possessed the cocaine. *Id.* at 847–48. As here, the government's case was entirely circumstantial, based on the fact that she lived in the apartment, had intimate ties with her co-defendant, and was involved with drugs herself. The court stated: "Those who spend considerable time in another's apartment, even those who 'live' there, do not for that reason possess everything on the premises. No one would say, for instance, that Zeigler 'possessed' Waite's spare clothing simply by knowing the contents of his dresser." *Id.* at 848.

Much the same, Matos did not automatically possess every item that Zayas brought into his home. Rather, as the D.C. Circuit held in another case, in order to find possession "there must be some action, some word, or some conduct that links the individual to the contraband and indicates that he had some stake in it, some power over it." *In re Sealed Case,* 105 F.3d 1460, 1463 (D.C.Cir.1997) (quoted approvingly in *United States v. McLean,* 409 F.3d 492, 501 (1st Cir.2005)). While Matos surely had access to the firearms, and left his own things alongside the pistol in the kitchen, one scours the record for any word or deed indicating that he in fact controlled those weapons in connection with the drug trafficking.

Each of these cases involved a situation where a low-level drug defendant was accused of possessing contraband plainly controlled by a more senior member of the drug ring. Although each court might have found joint possession, it did not, based on the scarce evidence that the defendant had actually intended to possess the drugs or guns. These courts did so *despite* a standard of review that delivered every favorable inference to the prosecution. The fact that these defendants lived in the apartments where the contraband was discovered, knew about the contraband, and sometimes even slept in the same room, did not require a possession finding in the face of facts to the contrary.

Applying a far more even-handed standard here, the Court reaches the same conclusion. Zayas brought the guns into Matos' house, hid them there, and periodically retrieved them to carry as personal protection on drug deals. *See* Zayas Trial Tr. 104–06. Matos, while involved in the packaging and selling of Zayas' drugs, did not help obtain the weapons, carry them on his person, or indicate any intention to use them. The inferences that may be drawn from the pistol's location are outweighed by Zayas' plain admissions, which are consistent with both the contours of the overall conspiracy and the rest of the record. Not even the government's cooperating witness reports having ever seen Matos handle or make reference to any of the firearms. As a result, the Court cannot say that Matos possessed the guns and finds, by a preponderance of the evidence, that he is eligible for the safety valve.

### B. "In Connection With" The Offense

 Even if a far more relaxed standard of possession were applied, the terms of § 3553(f) would not preclude application of the safety valve. Indeed, even if Matos could be said to have "possessed" the .25 caliber firearm simply by moving or shifting it above the kitchen cabinet, as the government argues, he would not have possessed the pistol "in connection with" the offense. 18 U.S.C. § 3553(f)(2). The safety valve's "in connection with" requirement demands a relationship between the defendant's firearm possession and the crime. Without that nexus, any possession falls outside the scope of the statute. *Cf.* 18 U.S.C. § 924(c) (containing a similar but slightly narrower "in furtherance of" requirement); *United States v. Grace,* 367 F.3d 29, 35 (1st Cir.2004) ("The mere presence of a firearm in an area where a criminal act occurs is not a sufficient basis for imposing [the] mandatory sentence [under § 924(c) ]."). Here, nothing shows that Matos—as opposed to Zayas—intended to use the guns in connection with his role in the drug conspiracy.[17]

While a gun's proximity to drugs has frequently been held enough to support the "in furtherance" prong, these cases are again often heavily shaped by the standard of review.[18] *See, e.g., Grace,* 367 F.3d at

17. As before, the Court notes that conspiratorial liability does not apply to a defendant's eligibility for the safety valve; thus, Zayas' use of the weapons may not be imputed to Matos. *See United States v. Figueroa–Encarnacion,* 343 F.3d 23, 34–35 (1st Cir.2003).

18. In addition to § 924(c) convictions challenged for the sufficiency of the evidence, the government relies on cases applying a firearm possession enhancement under U.S.S.G. § 2D1.1(b)(1). Contrary to the government's assertion, these cases are not readily comparable to the safety valve; they involve both a different nexus to the crime and a different burden-shifting mechanism. Where the safety valve requires that the defendant possess the weapon "in connection with" the offense, § 2D1.1 recommends an upward adjustment simply if the defendant possessed the weapon and it *"was present"* during the crime. U.S.S.G. § 2D1.1(b)(1) cmt. 3 (emphasis add-

ed); *see United States v. McDonald,* 121 F.3d 7, 10 (1st Cir.1997) ("[T]he prosecution need only prove that the defendant possessed the weapon during the currency of the offense, not necessarily that he actually used it in perpetrating the crime or that he intended to do so.") (citations omitted). Moreover, the burden rests on the defendant under § 2D1.1 to show that it was "clearly improbable" that the weapon had any connection to the crime. In particular, once the government has demonstrated that a firearm possessed by the defendant was present, "the burden shifts to the defendant to persuade the fact finder that a connection between the weapon and the crime is *clearly improbable." United States v. Anderson,* 452 F.3d 87, 90 (1st Cir.2006). The government has not shown that Congress intended § 3553(f)(2) to reach nearly as broadly as the enhancement that the Sentencing Commission inscribed in § 2D1.1(b)(1).

34–36 (assessing challenged § 924(c) conviction for sufficiency of the evidence, with facts viewed in the light most favorable to the prosecution); *United States v. Luciano*, 329 F.3d 1, 5–6 (1st Cir.2003) (applying "clear and gross injustice" standard to § 924(c) conviction and finding evidence "sufficient" to sustain jury's verdict); *United States v. Corcimiglia*, 967 F.2d 724, 726–27 (1st Cir.1992) (reviewing firearm enhancement under U.S.S.G. § 2D1.1(b)(1) for "clear error" and finding the evidence "sufficient"); *United States v. Anderson*, 452 F.3d 87, 92 (1st Cir.2006) (same); *United States v. McDonald*, 121 F.3d 7, 10 (1st Cir.1997) (same). As before, these appeals credit permissible inferences; they do not create a per se rule that frees this Court from a full factual inquiry.[19]

Even *United States v. Stark*, 499 F.3d 72 (1st Cir.2007), which involved an application of the safety valve, was a review for "clear error." It sustained the sentencing judge's factual finding that the gun was connected with Stark's drug trafficking where the district court "reasonably inferred that Stark brought the gun to protect himself and the large quantity of drugs that he was transporting." *Id.* at 80; *see also id.* (stating that "an appellate court ought not to disturb either findings of fact or conclusions drawn therefrom unless the whole of the record compels a strong, unyielding belief that a mistake has been made") (citing *United States v. Matos*, 328 F.3d 34, 39–40 (1st Cir.2003)). The defendant in *Stark* did not dispute that the gun was his; the only question was its relationship to the 377 pounds of marijuana also discovered in his RV. The district court's inference, based on the facts of the case, was held to be reasonable.

In these gun possession cases, the circuit courts are engaged in something very different from the undertaking expected of the district court. Appellate review for sufficiency of the evidence or clear error *presumes* that the fact-finder has conducted a full and thorough inquiry. Here, a district court cannot simply apply a standard designed for those appeals. To say that proximity and knowledge "may" suffice on appeal, with every inference in the government's favor, is not to say that they *always* prove possession in connection with the offense.

In short, the district court's inquiry does not end there. Without close scrutiny of the facts, suddenly statutes that expressly require possession be "in connection with" or "in furtherance of" the offense are permitted to reach nearly every crime where a gun was nearby. *See* 18 U.S.C. § 3553(f)(2); 18 U.S.C. § 924(c). Congress could have legislated that mere proximity or mere possession would disqualify a defendant from safety valve relief—but it did not. Instead, the statute requires that the defendant have possessed the weapon "in connection with" the offense, and that is the measure this Court applies. 18 U.S.C. § 3553(f)(2).

All told, in order to find that Matos is not eligible for the safety valve and must serve a mandatory minimum of 10 years, the Court would have to make multiple inferences: first, that Matos *intended* to exercise dominion and control over the guns; and, second, that he meant to possess the weapons "in connection with" the drug distribution conspiracy. In *McLean*, the First Circuit wrote, "[i]n sum, we think the inference of knowledge too tenuous to

---

**19.** This deference is particularly pronounced where the court of appeals sets out to review a jury's unexplained verdict and simply inquires whether *"any* rational trier of fact" could have reached the jury's conclusions. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

stand." 409 F.3d at 503. Refusing to stake possession on such a thin reed, it held McLean and his co-defendant, Berguette, eligible for the safety valve.

Much the same, in Matos' case the Court believes this double inference—essential to the government's case for constructive possession—is too tenuous to allow. On the record before it, the Court is unwilling to adopt that chain of inferences; it finds that Matos qualifies for the safety valve and a Guidelines-recommended sentence.

## VI. *SENTENCE*

■ Having determined that Matos meets all five criteria required to qualify for the safety valve, the Court must select a sentence that comports with the requirements of 18 U.S.C. § 3553(a), following the procedures laid out by the Supreme Court in *Rita* and *Gall.* 127 S.Ct. 2456 (2007); 128 S.Ct. 586 (2007). Accordingly, the Court begins by calculating the Guidelines recommendation offered by the 2007 Guidelines Manual, as amended on May 1, 2008. *See Gall,* 128 S.Ct. at 596; Matos PSR ¶ 22.

1. Since the drug trafficking conspiracy involved more than 1,000 kilograms but less than 3,000 kilograms of marijuana equivalency, Matos has a base offense level of 30. *See* U.S.S.G. § 2D1.1 & cmt. 10(D)(ii).

2. Because the Court finds that Matos did not possess the firearms, as explained above, it declines to apply the weapon enhancement under U.S.S.G. § 2D1.1(b)(1).

3. Likewise, it declines to apply any role reduction, despite the defendant's insistence that he qualifies as a minor participant under U.S.S.G. § 3B1.2(b). While Matos was a far less culpable participant than Zayas, the drug conspiracy's organizer, the Court cannot say that he was a minor participant when compared across the range of drug offenders that this Court has seen and sentenced. Although he had little to do with the weapons, he was a participant in the packaging and sale of the narcotics.

4. Nonetheless, Matos' acceptance of responsibility and safety-valve eligibility produce three and two level reductions, respectively, resulting in a total offense level of 25. *See* U.S.S.G. § 3E1.1; § 2D1.1(b)(7).

5. Because Matos has a criminal history score of I, the resulting Guidelines range is 57 to 71 months.

Importantly, the Court notes that the Guidelines recommendation is advisory, pursuant to *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), and that the recommendation is owed no presumptive weight by the district court. *See Rita,* 127 S.Ct. at 2465. In this case, however, on the facts presented to it, the Court finds that the low end of the Guidelines range, 57 months, is a reasonable and appropriate sentence. The Court rejects the defendant's request for a sentence of time-served (one month) and three years of supervised release with a special condition of six months' community confinement and six months' home confinement.

### A. Nature and Circumstances of the Offense

The Guidelines recommendation in this case, as in most drug cases, is almost completely driven by the drug quantity with which Matos was associated. To be sure, the drug quantity tables in the Guidelines have been widely criticized. Drug quantities were assigned to the various levels without any indication of how those levels related to the purposes of sentencing.[20] As a result, all too often the

20. One scholar writes:

To be useful in practical decision making, a

Guidelines' over-emphasis on the quantity of drugs involved in an offense fails as a reliable measure of the defendant's culpability.[21] At the same time, the available role reductions are rarely sufficient to offset the extent to which drug quantity controls the recommended sentencing range. In such cases, this Court has not hesitated to impose a lesser, non-Guidelines sentence. *See, e.g., United States v. Haynes,* 557 F.Supp.2d 200 (D.Mass.2008); *United States v. Maisonet,* 493 F.Supp.2d 255 (D.P.R.2007); *United States v. Garrison,* 560 F.Supp.2d 83 (D.Mass.2008); *United States v. Ennis,* 468 F.Supp.2d 228 (D.Mass.2006); *United States v. Jaber,* 362 F.Supp.2d 365 (D.Mass.2005).

But while Matos was significantly less involved in the drug conspiracy than Zayas, he was not simply a drug mule or "gofer" who transported drugs on one or several occasions. *See United States v. Jurado–Lopez,* 338 F.Supp.2d 246, 247 (D.Mass. 2004). As the Court observed above, Matos was a continuing, if lesser, participant; he permitted Luis Zayas to store and package large quantities of cocaine in his house over the course of at least a year. These activities were all the more troubling since they took place in a space occupied by his family and young children.

### B. Deterrence and Rehabilitation

As the Court notes in its safety valve analysis, Matos had little criminal history prior to the instant offense. But having found Matos eligible for the safety valve, the Court finds no further basis for a reduced sentence on this record. Counsel offered no explanation for the events or circumstances in Matos' life that caused this lapse—what pressure or influence came from Zayas, or what financial exigencies. How had he been making a living prior to the time of the offense? How central was the drug-dealing in his life? *See Haynes,* 557 F.Supp.2d 200; *Maisonet,* 493 F.Supp.2d 255. Matos was not himself addicted to drugs, a factor that could have explained his appalling judgment and suggested alternatives to imprisonment. Altogether, the Court found nothing in an otherwise law-abiding life that might have helped it understand whether recidivism was likely or not.

### C. The Guidelines Sentencing Range

To be sure, in the Court's judgment, the Guidelines sentences for non-violent drug offenders are much, much too high as a general matter to effect the purposes of punishment. Moreover, this Court does

---

sentencing philosophy for a guidelines system must articulate the purposes the rules are meant to achieve. The purposes must be prioritized so that conflicts among them can be resolved. Importantly, how the rules are meant to accomplish their purposes should be explained. For example, how is pecuniary loss or drug quantity relevant to the seriousness of a crime? Such explanations are especially needed when the rules are not direct measures of the morally relevant dimensions, but are instead 'proxies' or 'rules-of-thumb' that usually work, for example, to identify the most dangerous offenders, but that may go wrong in some circumstances.

Hofer, Immediate and Long–Term Effects of *United States v. Booker*: More Discretion, More Disparity, or Better Reasoned Sen-

tences? 38 Ariz. St. L.J. 425, 451 (2006) (footnotes omitted).

**21.** As Hofer notes: "The frequent failure of drug quantity to track offense seriousness has been one of the most persistent criticisms of the guidelines. Even Stephen Breyer, a former Commissioner, and current Supreme Court Justice, has noted that the exact amount of drugs or monetary loss involved in an offense gives the Guidelines a 'false precision' that may not properly reflect the moral foundation on which the guidelines rest." Hofer, *supra* note 20 at 446 n. 103 (citing Stephen Breyer, Assoc. Justice, U.S. Supreme Court, Address at University of Nebraska College of Law: Federal Sentencing Guidelines Revisited (Nov. 18, 1998), in 11 Fed. Sent'g Rep. 180 (1999)) (internal citations omitted).

not stand alone in that analysis.[22] But before the Court sentences a defendant to a particular period of time, it needs a rationale, beyond the general policy judgment of an individual judge.

For example, in the case at bar, there was no information about why a sentence of 24 months rather than 36 or 57 months would accomplish deterrence, appropriately incapacitate this individual, or prevent recidivism. There was no information about how other judges sentenced similarly situated individuals. There was no information about the likely conditions of Matos' confinement, and little information about the impact of Matos' incarceration on his family. While Matos is surely close to his family, the record provided no basis for adjusting his sentence on this ground. In short, there were no factors—individual to Matos or the crime he committed—that suggested 57 months imprisonment was an inappropriate sentence.

Rather, where the only reason why the Court would reject a Guidelines sentence is because of its disagreement with the Guidelines' policy choices, that is not sufficient in and of itself.[23] Accordingly, on the record before the Court, it finds that the sentence fits the offense and offender.

## VII. *CONCLUSION*

For the reasons stated above, **the Court sentences Matos to 57 months' imprison**ment, **5 years' supervised release, and a special assessment of $500.00.**

**SO ORDERED.**

---

22. "73.7 percent of district court judges and 82.7 percent of circuit court judges [rate] drug punishments as greater than appropriate to reflect the seriousness of drug trafficking offenses." *See* United States Sentencing Commission, Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform 52 (2004), *available at* http://www.ussc.gov/15_year/15year.htm.

23. This approach is considerably different from identifying a reasoned basis to challenge a particular guideline, as with the crack co-caine guideline in *Kimbrough*. *See* 128 S.Ct. 558. In many ways, the question before the Supreme Court in *Kimbrough* was akin to a challenge to a regulation under the Administrative Procedure Act, namely, that the Commission's guideline had no rational relationship to the facts on which it was purportedly based—the differences between crack and powder cocaine. *See* 5 U.S.C. §§ 701, 706(2)(A) (providing that a court shall hold unlawful and set aside agency actions that are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").